2024 IL App (2d) 230106
No. 2-23-0106
Opinion filed March 27, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CF-451 |
| | ) | |
| WILLIAM P. BISHOP, | ) | Honorable |
| | ) | Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Schostok and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial, defendant, William P. Bishop, was found guilty but mentally ill of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)), a Class M felony, and guilty of aggravated driving under the influence (DUI) (625 ILCS 5/11-501(a) (West 2020)), a Class 4 felony. The trial court rejected defendant's insanity defense, finding that he did not prove by clear and convincing evidence that he lacked the substantial capacity to appreciate the criminality of his conduct at the time of the offense. Defendant was sentenced to a total of 31 years in the Illinois Department of Corrections. On appeal, defendant argues that (1) the trial court erred in determining that he was not legally insane at the time of the offense and (2) section 11-501(a)(7) of the Illinois Vehicle

Code (*id.* § 11-501(a)(7)) violates the equal protection clause of the Illinois and United States Constitutions. For the reasons that follow, we disagree with both contentions and affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On June 9, 2020, the State charged defendant with several offenses stemming from his vehicular suicide attempt that resulted in the death of Jason E. Miller and great bodily harm to Rory J. Fiali. On September 24, 2020, a grand jury returned an amended bill of indictment charging defendant with 11 felony counts.

¶ 4     On September 1, 2022, defendant filed a motion to declare section 11-501(a)(7) of the Vehicle Code unconstitutional. Defendant filed the same motion again on September 6, 2022. The Office of the Illinois State Attorney General was properly notified and deferred to the McHenry County state's attorney to respond. See Ill. S. Ct. R. 19 (eff. Sept. 1, 2006).

¶ 5     In his motion, defendant argued that subsection (a)(7) violated the equal protection clause of both the Illinois and United States Constitutions. In support of his motion, defendant alleged that similarly situated persons charged in Illinois pursuant to section 11-501(a)(7) of the Vehicle Code were divided, without a rational basis, into two groups: drivers who possess a Compassionate Use of Medical Cannabis Program Act (Medical Cannabis Act) card (registry card), allowing the use of medical cannabis, and drivers who do not. Defendant points out that individuals without a registry card are held to a *per se* standard, where intoxication is presumed if, within two hours of driving or being in actual physical control of a vehicle, an individual has a tetrahydrocannabinol (THC) concentration of either 5 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of whole blood or 10 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of other bodily substance. 625 ILCS 5/11-501.2(a)(6) (West 2020). The State is required to prove intoxication, regardless of THC concentration, if an individual with a valid registry card is charged

pursuant to section 11-501(a)(7) of the Vehicle Code. Defendant further argues that there is no rational basis for this disparate treatment, as there is no comparable distinction made for alcohol users and there is no evidence of the legislature's reasoning for the disparate treatment.

¶ 6    The State responded by stating that defendant's argument fails at its inception because he cannot establish that he is similarly situated to the comparison group. In order to be similarly situated for purposes of an equal protection analysis, the groups must be alike in all relevant aspects. The State argued that defendant is not similarly situated to a motorist with a registry card because, to obtain a registry card, an individual must suffer from an underlying medical condition and receive a medical prescription, which requires a doctor's oversight and warnings. Even so, the State further argued, if any disparate treatment exists, the statute survived rational basis scrutiny because it is rationally related to the legitimate state interest of maintaining safe roadways.

¶ 7    The trial court agreed with the State, noting that there is a presumption that all statutes are constitutional and finding that "the two subject groups in this case are not similarly situated." The trial court further found that, "even if there is a similarity, there is a rational basis for the different classifications or for the different treatment, and accordingly *** the motion to find 501(a)(7) [unconstitutional] is denied."

¶ 8    Before trial, the State moved to dismiss counts II, III, V, VII, VIII, and IX of the amended indictment. On October 17, 2022, the case then proceeded to a bench trial on count I, of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)), counts IV and VI, of aggravated battery (*id.* § 12-3.05(a)(1), (f)(1)), and counts X and XI, of aggravated driving under the influence brought under section 11-501(a)(7) of the Vehicle Code (625 ILCS 5/11-501(a)(7) (West 2020)).[1]

_____

[1]Counts IV and VI, the aggravated battery counts, both named Fiali as the victim. Count

¶ 9    In the State's case-in-chief, the State called 18 witnesses and presented two written stipulations that were read into the record. Only witness testimony relevant to this appeal is summarized below.

¶ 10    Jeanne and Todd Berge, the first witnesses who arrived on scene, both testified. They testified that they were in a parking lot near the location of the accident on Vanderkarr Road in Hebron. They were standing outside of their vehicles when they heard a loud bang. They ran towards the noise and saw two vehicles: a van turned over on its side and another vehicle behind it. Jeanne testified that she called 911. The call was admitted into evidence as People's exhibit 2. Jeanne and Todd both testified that they were able to speak to defendant. Jeanne said that defendant was able to get out of his vehicle by himself and was appropriately responsive to questions. Todd also testified that defendant was able to get out of his vehicle by himself and commented to him that he "just looked down at [his] radio." After that interaction, neither Jeanne nor Todd had any further contact with defendant.

¶ 11    Gail Hall was also called as a witness for the State. She testified that, on the day of the accident, she was driving home and came upon the scene. She pulled over to help. She testified that she spoke to defendant and he seemed dazed. She asked him to come sit in her car until emergency personnel arrived on scene, and he obliged. Once in her vehicle, she was able to converse with defendant. She asked defendant what his name was and where he lived. He

IV was aggravated by virtue of defendant's use of a deadly weapon (namely, a vehicle). Count VI was aggravated, as Fiali suffered great bodily harm as a result. Count X, one of the aggravated DUI counts, was aggravated because it resulted in the death of Miller. Count XI, the other aggravated DUI count, was aggravated because it resulted in great bodily harm to Fiali.

responded that his name was Bill and he lived in Chicago. She then asked him if he was hurt, but he began to mumble and did not engage in any further meaningful conversation with her. Hall testified that she stayed with defendant for approximately 10 to 15 minutes until first responders arrived on scene. Once defendant was with first responders, Hall left the scene.

¶ 12   Lloyd Laufer, a firefighter and paramedic who responded to the accident, also testified. He testified that he spoke with defendant on the scene. Laufer asked defendant if he was okay, and defendant responded that he was fine. Laufer testified that, based on his quick assessment of defendant, he believed that defendant was talking fine and had no visible injuries. Laufer also testified that defendant told him to check on the other individuals involved in the accident. After that brief conversation, Laufer had no other contact with defendant.

¶ 13   Jason Novak, a deputy with the McHenry County Sheriff's Office, testified that he responded to the accident. When he arrived, several emergency vehicles were already on scene. Novak made contact with defendant. Novak testified that he observed defendant to have a red, swollen injury to the right side of his face and fresh blood on his forearm. Defendant also seemed "kind of out of it." Novak asked defendant for his information, and defendant was able to respond appropriately. Novak testified that defendant was speaking clearly and for the most part was responsive to his questions. He then asked defendant about the accident. Defendant responded that he was driving westbound on Vanderkarr Road and that the accident was his fault. Novak followed up by asking how the crash occurred. Defendant started to talk about the radio. Novak then asked defendant if he had crossed the center portion of the roadway. Defendant responded with a blank stare. After this, medical personnel came to assess defendant and Novak had no further interaction with defendant.

¶ 14 Zachary Ignoffo testified that he was a firefighter paramedic with the Wonder Lake Fire Department. On the day of the accident, he was dispatched to the scene at Vanderkarr Road. He was one of the paramedics who medically assessed defendant while on scene. Ignoffo testified that he asked defendant if he had any injuries. Defendant responded, but his response was delayed. Defendant told Ignoffo that he had abdominal and lower back pain. Ignoffo also asked defendant if he had lost consciousness at any point. Defendant responded that he was not sure if he lost consciousness. Ignoffo asked if defendant remembered the accident, and defendant responded that he did not. Ignoffo asked if defendant had been wearing a seatbelt, and defendant responded that he had. Ignoffo testified that this answer was consistent with the lower abdominal injuries that defendant exhibited. Ignoffo also asked defendant about any medication or alcohol and drug use. Defendant responded that the only medication he was on was melatonin and that he had used marijuana. When asked when had last used marijuana, defendant did not answer. Ignoffo testified that defendant was generally responsive to questions. However, when he was asked what caused the accident, defendant responded that he was very deep in thought. Defendant made this statement approximately 15 times during transport. Ignoffo diagnosed defendant with an altered mental status. Once the ambulance arrived at Northwestern Medicine McHenry Hospital (Northwestern McHenry Hospital), care of defendant was handed off to the hospital staff and Ignoffo had no further contact with defendant.

¶ 15 Dr. Steven Singh testified that he was a general surgeon at Northwestern McHenry Hospital. He treated defendant after the accident. Dr. Singh testified that defendant reported that he was driving his car, that he wanted to kill himself, and that he drove his car into another vehicle on the highway. Defendant also reported mild to moderate pain in his abdomen, but no other significant pain or injury. Dr. Singh performed a physical examination on defendant and kept him

overnight for observation. Dr. Singh testified that part of the reason defendant was kept overnight was due to his suicidal ideation. Throughout his interaction with defendant, Dr. Singh did not have any issues communicating with defendant.

¶ 16    Joan Rembacz, a registered nurse at Northwestern McHenry Hospital, was also called as a witness for the State. On the day of the accident, she was called to assist in the emergency room department. She testified that she met with defendant in the emergency room. She described his demeanor as very quiet and anxious. When she and one of the other nurses asked him questions, he did not respond. Rembacz testified that defendant was responsive to directions he was given. For example, she asked him to remove his clothes and put on a gown. Defendant was able to comply. She also testified that, in her 40 years of experience as a nurse, she has had occasion to see actively psychotic patients. She did not believe defendant to be actively psychotic, nor did she believe he was catatonic. Rembacz testified that she was present when the police interviewed defendant and that defendant was more responsive to their questions than he was to hers. She also testified that defendant spoke about the radio giving him ideas and wanting to end his life.

¶ 17    Andrew Thomas, a sergeant with the McHenry County Sheriff's Office, testified that he was a member of the major crash investigation unit. On the day of the accident, he responded directly to the hospital to begin his investigation. Thomas testified that he spoke with defendant after he had read to defendant the traffic crash "Warning to Motorists" and defendant provided a blood and urine sample. Thomas's conversation with defendant was recorded and was admitted into evidence as People's exhibit 9. Thomas testified that defendant stated that he had seen the oncoming truck, there was nothing in his lane that required him to leave his lane, he had to end his life or it was the end of life, and he purposely crossed the center line. When asked if he had consumed any drugs or alcohol, defendant responded that he had consumed two beers the night

before the accident and that he had used his THC vape pen within the last 24 hours. Thomas testified that defendant, throughout the interview, would fidget with his hands. He also seemed hesitant and measured with his answers. Overall, defendant was cooperative. Thomas testified that he was present for part of defendant's subsequent interview with Deputy Trent Raupp.

¶ 18    Thomas was received as an expert in accident reconstruction. Thomas testified that, utilizing multiple different methods, he was able to determine the speed of the vehicles at impact. He used data from both vehicles' event data recorder and a Monte Carlo simulation to determine impact speed. As to defendant's vehicle, Thomas testified that, five seconds prior to impact, defendant was travelling approximately 64 miles per hour. Defendant continued to increase his speed until, 0.2 seconds before the crash, he reached a top speed of approximately 84 miles per hour. Thomas also testified that the victims' vehicle was steering to the right and braking up until the point of impact. Defendant's vehicle was steering to the left and accelerating.

¶ 19    Raupp, a detective with the McHenry County Sheriff's Office, was also called as a witness for the State. On the day of the accident, he responded to Northwestern McHenry Hospital to conduct an interview with defendant. This interview was recorded and was admitted as People's exhibit 24. Raupp testified that defendant was cooperative and answered, or attempted to answer, every question that was asked of him. At some point in the interview, defendant began to cry. Raupp testified that defendant said that he heard instructions coming from the radio. When Raupp repeated that back to him, defendant corrected him and said that it was not the radio that told him, it was the thoughts in his own head. Defendant also told Raupp that his goal with the crash was to take his own life. After the interview concluded, Raupp had no further contact with defendant. The State called two other witnesses and then rested.

¶ 20    Defendant then proceeded with his case-in-chief. He called two of his treating psychiatrists, Dr. Iyad Alkouri and Dr. Elizabeth McMasters, and two experts, Dr. Carl Wahlstrom and Dr. Stafford Henry.

¶ 21    Dr. Alkouri was a psychiatrist with Northwestern Medicine who treated defendant after the accident. He testified that, upon defendant's admission to the inpatient psychiatric unit, he had defendant undergo a psychiatric interview. This involved an assessment of defendant, discussion with medical staff, and a review of defendant's medical records. After completion of this interview, Dr. Alkouri concluded that defendant was in a manic episode where he was not in complete touch with reality. Dr. Alkouri testified that he reached this conclusion because defendant exhibited pressured speech, euphoria, and an illogical chain of thoughts. Dr. Alkouri described pressured speech as "the rhythm of it is way too fast for other people to even comprehend what the person is saying." He testified that he concluded defendant was euphoric because defendant did not appear to comprehend the gravity of the accident. Dr. Alkouri also testified that he determined defendant's chain of thoughts was not logical because he kept referring to the accident as "part of a *** game or kind of a peril existence." He also referred to the accident as "part of a dare from voices in his mind at that time that were telling him that nothing really bad is going to happen or that he is being dared to do it and being pressured to just do it." Dr. Alkouri testified that he diagnosed defendant with a manic episode. This diagnosis was for the time of treatment and not retroactive to the time of the accident. Dr. Alkouri also testified that he considered the potential effect of defendant's cannabis and alcohol use and concluded that the symptoms defendant was displaying were out of proportion for what any of the substances may have caused.

¶ 22    Dr. Alkouri testified that he started defendant on a treatment plan for bipolar disorder. Defendant remained at the acute psychiatric unit at Northwestern McHenry Hospital for about

three weeks, receiving treatment. Dr. Alkouri testified that he did not believe defendant was ever transferred to the general psychiatric unit. Throughout defendant's treatment, he made very slow progress. Even at the point defendant was discharged, Dr. Alkouri did not believe he was fully recovered. Dr. Alkouri also testified that he did not see any signs that defendant was malingering, *i.e.*, making up his symptoms.

¶ 23    On cross-examination, Dr. Alkouri testified that he would recommend against bipolar patients self-medicating with marijuana, as it can exacerbate bipolar symptoms, including mania. He also testified that, although he kept malingering in the back of his mind while treating defendant, he did not conduct any psychological testing to accurately assess for it. Dr. Alkouri testified that defendant, when talking about the accident, provided an explanation for why it happened and seemed to immediately grasp that it was not the right thing to do.

¶ 24    Defendant then called Dr. McMasters, a psychiatrist with Northwestern Medicine, as his next witness. McMasters testified that, in her role as attending psychiatrist, she treated defendant in May 2020. Over the course of the two-week period defendant was her patient, she met with defendant personally approximately nine times. She diagnosed him with bipolar mania with psychosis, presenting with severe symptoms. She testified that she observed defendant being very well-groomed with appropriate hygiene, although he was restless with difficulty focusing and an air of superiority. On cross-examination, Dr. McMasters also testified that she had some reservations about defendant knowing what he had done; he did not express any concern for the victims and instead was focused on "how expensive this is going to be." She further testified that, in addition to the bipolar diagnosis, she also diagnosed defendant with severe cannabis use disorder, which exacerbated his bipolar symptoms.

¶ 25    Next, defendant called his two expert witnesses: Dr. Whalstorm and Dr. Henry. Dr. Wahlstrom, a psychiatrist board certified by the American Board of Psychiatry and Neurology in general psychiatry and forensic psychiatry, testified first. He testified that he had experience as an expert witness; he could not give a number as to how many times he had testified as an expert, because he has been doing it for so long. Dr. Wahlstrom testified that the defense had retained him to prepare a written report regarding defendant. At the time of trial, he had invoiced defense counsel $60,137.

¶ 26    Dr. Wahlstrom met with defendant twice in preparation of his report—once in person for 3½ hours and once by phone for half an hour. He also testified that he interviewed defendant's mother, defendant's therapist, and defendant's current treating doctor in preparation for his report. Additionally, he reviewed numerous documents and recordings, including copies of police reports, recorded interviews with defendant, and defendant's medical records.

¶ 27    During the in-person meeting, Dr. Wahlstrom administered 11 surveys to defendant to analyze his mental condition and sanity at the time of the accident. Dr. Wahlstrom testified that the survey results were significant for indicating moderate bipolar disorder and mild major depressive disorder. Dr. Wahlstrom also spoke with defendant about his history of mental illness and then focused on the time period in and around the accident. Dr. Wahlstrom testified that he learned from defendant that he had a history of bipolar disorder and some history of alcohol and marijuana use, as well as a prior hospitalization for suicidal ideation. He also testified that, in the days preceding the accident, defendant started exhibiting bipolar symptoms, such as loss of sleep, rapid or racing thoughts, feeling disorganized, and problems focusing.

¶ 28    Dr. Wahlstrom testified that defendant stated that, on the day of the accident, he woke up anxious, confused, and fearful. He got into his car to head to his family's home to discuss an issue

with his father. During the drive, he began to experience a lot of paranoid thoughts and fear that he was in trouble and being monitored. His thoughts became more and more disoriented. During a radio interview with Howard Stern and David Spade, defendant began to believe that the interview included him and that Stern and Spade were speaking directly to him. Dr. Wahlstrom testified that this was a delusion, or idea, of reference—a fixed false belief that something in the environment is specifically pertaining to you. Defendant also talked to Dr. Wahlstrom about command hallucinations. Defendant said he felt agitated, like he immediately needed to end his life. He also felt as though he was receiving command hallucinations telling him to play chicken with the approaching car.

¶ 29   Dr. Wahlstrom testified that he diagnosed defendant with bipolar disorder with psychotic features. He also testified that it was his opinion that defendant suffered from a very serious mental disorder at the time of the accident (namely, bipolar), such that "he was not able to step back and really perceive the reality of the situation and was unable to appreciate *** the wrongfulness of criminality of his conduct."

¶ 30   Dr. Henry was defendant's other expert witness. He testified that he is a triple board-certified psychiatrist, with certifications in general psychiatry, addiction psychiatry, and forensic psychiatry. He has been working in the field of forensic psychiatry since the early 1990s and has testified as an expert in the field of forensic psychiatry several hundred times. Dr. Henry testified that he was initially retained by the State, and he was not retained to prepare a report but rather to conduct an evaluation; after the evaluation, he was asked to draft a report. Dr. Henry testified that the State compensated him $14,000. The defense then retained Dr. Henry to testify at trial.

¶ 31   Dr. Henry testified that he reviewed defendant's medical records, defendant's police reports, police interviews with defendant, some of defendant's social media postings, and

recordings of phone calls from the county jail between defendant and his mother. He also met with defendant for 7½ hours.

¶ 32   During the interview, Dr. Henry learned that defendant had a long history of cannabis and alcohol use and occasional cocaine use. Defendant also self-reported interchanging periods of mania and depression dating back to 2016. Defendant described having experienced psychotic symptoms, such as hallucinations, ideas of reference, grandiosity, hyper-religiosity, and increased goal-directed activity.

¶ 33   Dr. Henry testified that defendant described his mental state the night before the accident as overwhelmed. Defendant was anxious, having difficulty sleeping, and experiencing ideas of reference. On the morning of the accident, defendant described himself as irritable and overwhelmed with racing thoughts and anxiety. He also said he was hearing voices.

¶ 34   Defendant told Dr. Henry that, as he was driving along I-90/I-94, he was listening to an interview with Howard Stern and David Spade and believed that they were speaking to him. Defendant described it as if they had posed questions to him. Dr. Henry testified that he would describe these symptoms as ideas of reference.

¶ 35   Dr. Henry testified that, throughout the interview, defendant seemed rehearsed. Certain of defendant's responses seemed pulled directly from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). His responses did not seem genuine and authentic. Some of his answers also were not consistent with answers given to other medical and mental health care providers, as indicated in his medical records. For example, defendant reported only occasional cocaine use to Dr. Henry, but defendant's medical records indicate that he had relayed heavy cocaine use.

¶ 36   Dr. Henry further testified that he diagnosed defendant with bipolar disorder, alcohol dependence in sustained remission, cannabis dependence in sustained remission, cannabis abuse in sustained remission, other substance abuse in sustained remission, and narcissistic personality disorder. He further opined that defendant was insane at the time of the accident. The defense then rested.

¶ 37   The State called Dr. Edward Mahoney, a clinical psychologist, as its sole witness in rebuttal. At the time of his testimony, he was working as a transplant psychologist with Advocate Christ Medical Center, but he had experience in forensic psychology dating back to when he was working on his doctorate degree. He also worked for the Federal Bureau of Prisons as a forensic psychologist and then went on to work as a forensic psychologist in private practice. He has testified as an expert witness in forensic psychology approximately 80 times. In terms of the instant case, Dr. Mahoney testified that, although he had not interviewed defendant personally, he had reviewed a plethora of records in order to reach his opinion, including a copy of the indictment, the protective order pursuant to the Health Insurance Portability and Accountability Act, two audiotapes of defendant's interviews with detectives on May 18, 2020, medical records from One Medical, forensic reports submitted by Dr. Henry and Dr. Wahlstrom, copies of all incident reports prepared by officers of the McHenry County Sheriff's Office, recordings of county jail phone calls made by defendant, copies of medical records from St. Alexis Medical Center, copies of behavioral records prepared by psychiatric nurse practitioner Nimat Acorede, copies of medical records from Rush Hospital, copies of medical records from Northwestern McHenry Hospital, copies of medical records from Northwestern McHenry Hospital's psychiatric unit, a YouTube video of defendant

dated June 15, 2021, a YouTube interview of David Spade by Howard Stern broadcast on May 18, 2020,[2] and progress notes and e-mails between defendant and therapist Ryan Higgins.

¶ 38    When asked why he chose not to interview defendant, Dr. Mahoney responded, "there are times that you do not interview the defendant." Some factors Dr. Mahoney considered in making the decision not to interview defendant included the period of time that had passed since the incident, how many experts had already issued reports, and the number of records that were available for review. Dr. Mahoney testified that, because a significant amount of time had passed since the incident and because of the multiple experts already involved and the sheer volume of records for review, he determined that a personal interview was unnecessary. Dr. Mahoney also noted that in the most recent interview defendant had undergone, he seemed rehearsed in his responses. According to Dr. Mahoney, these rehearsed responses are common the farther away one gets from the incident, but they limit the amount of helpful information that can be obtained from a defendant in an interview setting.

¶ 39    Dr. Mahoney testified that, after an extensive review of all the records, he diagnosed defendant with bipolar I disorder, manic with psychotic features; severe cannabis use disorder; and severe alcohol use disorder. He further testified that, although defendant had met the first prong of the insanity defense, he did not meet the second, for several reasons. First, cannabis and alcohol use had an effect on defendant's mental illness. Cannabis specifically exacerbates bipolar symptoms, including suicidal ideations. Defendant also has a history of suicidal ideation coupled with cannabis use dating back to 2013. Second, Dr. Mahoney did not believe that defendant was experiencing command hallucinations at the time of the accident; rather, he was experiencing delusions of reference. There was no indication of a command hallucination in the immediate

---

[2]The interview defendant was listening to on the radio at the time of the incident.

aftermath of the accident. Defendant brought up command hallucinations much later while he was in the hospital. Dr. Mahoney testified that, with delusions of reference, an individual is still able to use his or her own judgment and reasoning and still maintains the ability to direct his or her own behavior. He also noted that, even with a command hallucination, an individual does not have to respond to it. Third, defendant was suicidal at the time of the accident. Dr. Mahoney determined this based on interactions defendant had with officers on the scene as well as interviews with the other experts. Defendant expressed that he was extremely stressed and had had suicidal thoughts in the days leading up to the accident. Fourth and finally, defendant demonstrated goal-directed behavior up until the accident. He was able to drive a car, wake up, get himself dressed, and buy himself breakfast. He didn't leave his house hastily; rather, he packed his things and put them in the car.

¶ 40    Dr. Mahoney testified that an individual can be actively psychotic and still be legally sane; a bipolar diagnosis with active psychosis does not automatically render an individual legally insane. Dr. Mahoney testified that, even with defendant's bipolar diagnosis, it was still his opinion that defendant was legally sane at the time of the accident: "[d]ue to the self-ingestion *** of cannabis and alcohol, it created and exacerbated symptoms of his bipolar disorder. Depression was one of those symptoms that exacerbated which caused him to become suicidal and on the day of the offense he attempted to commit suicide."

¶ 41    After Dr. Mahoney's testimony, the State rested and the parties proceeded to closing arguments. The defense, prior to closing arguments, renewed defendant's motion to declare section 11-501(a)(7) of the Vehicle Code unconstitutional. The trial court then took the matter under advisement and continued the case to November 7, 2022, for decision.

¶ 42   On November 7, 2022, the trial court incorporated its prior findings sustaining the constitutionality of section 11-501(a)(7) of the Vehicle Code and found defendant guilty of both counts of aggravated DUI (counts X and XI) and guilty but mentally ill of both counts of aggravated battery (counts IV and VI) and the single count of first degree murder (count I). In doing so, the trial court also found that defendant had failed to prove by clear and convincing evidence that he is not guilty by reason of insanity. In making this finding, the trial court stated as follows:

> "The question of Defendant's sanity and mental illness are questions of fact. Both sides correctly have argued that pursuant to the criminal code, a person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct.
>
> ***
>
> There is no dispute that at the time of the events in question that Mr. Bishop was suffering from a mental disease or defect.
>
> * * *
>
> While the State challenges the affect [*sic*] of the Defendant's condition, it does not meaningfully argue that Mr. Bishop was not suffering from a mental disease or defect at the time of the incident. The question, then, is whether the Defendant has proven, by clear and convincing evidence, that because of this mental disease or defect he lacked the substantial capacity to appreciate the criminality of his conduct. While not solely dispositive, the starting point of this analysis is the expert testimony."

¶ 43   The trial court then robustly discussed each of the three testifying experts, finding each credible and ultimately concluding that the expert testimony resulted in "an evidentiary tie" and

that defendant's experts alone did not meet the burden of proof. The trial court moved on to discuss the lay testimony that was based on observations made shortly before or after the crime, referencing the testimony of eight different lay witnesses who each observed defendant shortly after the crime. The trial court concluded by stating: "Based upon the whole of the evidence, parts of which have been recited in this narrative, the Court cannot and does not find that the Defendant has proven, by clear and convincing evidence, the affirmative defense of insanity."

¶ 44 Defendant filed a motion to reconsider the finding of guilty, arguing that the expert testimony, his treating physicians' testimony, and the lay testimony established his affirmative defense of insanity by clear and convincing evidence. On December 22, 2023, the trial court denied that motion. The matter proceeded to sentencing on January 26, 2023. The trial court vacated the conviction of count X under the one-act, one-crime doctrine.[3] It also merged count IV into count VI and then vacated the conviction of count VI under the one-act, one-crime doctrine.[4] Defendant was then sentenced to 24 years on count I (first degree murder) and 7 years on count XI (aggravated DUI), to run consecutively. Defendant filed a motion to reconsider the sentence, which was denied on March 16, 2023. This timely appeal followed.

---

[3]Count X, one of the aggravated DUI counts, was aggravated because the offense resulted in the death of Miller, as did the offense charged in count I, first degree murder. Thus, the one-act, one-crime doctrine was implicated. Similarly, counts IV, VI, and XI all involved the injury to Fiali, and the one-act, one-crime doctrine was again implicated.

[4]The trial court explained that the sentence was imposed on count XI, as opposed to count VI, because, even though count XI charged a lower-class felony, the offense has a longer sentencing range and requires an 85% sentence.

¶ 45                                    II. ANALYSIS

¶ 46    Defendant contends on appeal that (1) the trial court erred in determining that he was not legally insane at the time of the offense and (2) section 11-501(a)(7) of the Vehicle Code violates the equal protection clause of both the Illinois and United States Constitutions. We disagree.

¶ 47    We begin our analysis with defendant's contention that that the trial court erred in finding that he was not legally insane at the time of the offense. In Illinois, an individual is not criminally responsible for their conduct if, as a result of a mental disease or mental defect, he or she lacks the substantial capacity to appreciate the criminality of his or her conduct. 720 ILCS 5/6-2(a) (West 2020). When a defendant raises the affirmative defense of insanity, the burden of proof is on the defendant to prove the defense by clear and convincing evidence. *Id.* § 6-2(e). However, the State still must prove each element of the charged offense or offenses beyond a reasonable doubt. *Id.* Whether a defendant was sane at the time of an offense is generally a question for the trier of fact. *People v. Plackowska*, 2020 IL App (2d) 171015, ¶ 48 (citing *People v. McDonald*, 329 Ill. App. 3d 938, 946 (2002)). A trial court's determination of sanity will not be disturbed unless it is against the manifest weight of the evidence. *People v. Urdiales*, 225 Ill. 2d 354, 428 (2007) (citing *People v. Johnson*, 146 Ill. 2d 109, 128-29 (1991)). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

¶ 48    It is undisputed that defendant suffered a mental disease or defect. Defendant's insanity defense turned on whether, because of that mental disease or defect, he was unable to appreciate the criminality of his conduct. Our analysis is therefore focused on this question.

¶ 49    Defendant argues that the trial court should not have given any weight to Dr. Mahoney's testimony and instead should have relied on defendant's two experts and accordingly found him

legally insane. He argues specifically that (1) Dr. Mahoney's testimony was confused and contradictory, (2) Dr. Mahoney is biased and ignored defendant's command hallucinations, and (3) Dr. Mahoney violated Rule 9.01 of the Ethical Principles of Psychologists and Code of Conduct of the American Psychological Association (APA) (hereinafter APA Code). See Am. Psychological Ass'n, Ethical Principles of Psychologists and Code of Conduct (2017), https://www.apa.org/ethics/code/ethics-code-2017.pdf [https://perma.cc/M84U-XREX]. None of these arguments are compelling.

¶ 50    First, defendant contends that Dr. Mahoney's testimony was confused and contradictory and, therefore, the trial court should not have given it any weight. In support of this, defendant cherry-picks singular quotes from Dr. Mahoney's testimony, out of context. However, it is important to view Dr. Mahoney's testimony as a whole. For example, defendant states in his brief that "Dr. Mahoney did believe that Mr. Bishop suffered from psychosis, which was 'a break from reality.' " While this is in part an accurate summation of Dr. Mahoney's testimony, defendant conveniently neglects to acknowledge the statement immediately after: "You know, it's a break from reality, but you have to look at the data. Again, as I testified before, psychosis doesn't mean somebody is not aware of the wrongfulness of their actions." In particular, defendant takes issue with Dr. Mahoney's testimony regarding defendant's cannabis consumption. He states that Dr. Mahoney claimed defendant did not meet the second prong of the insanity defense because of "volitional self-ingestion of cannabis and alcohol" but failed to explain how the *influence* of cannabis or alcohol diminished the veracity of an insanity defense. Again, viewing Dr. Mahoney's testimony in context, there was sufficient explanation. Dr. Mahoney, as part of his multi-factored analysis, noted that defendant's cannabis or alcohol use exacerbated his depression, causing

defendant to become suicidal and attempt suicide. Defendant was still aware of the wrongfulness of his actions, despite the influence of cannabis or alcohol.

¶ 51 Viewing Dr. Mahoney's testimony in proper context, it is not confused and contradictory as defendant asserts. Instead, it is rooted in reliable data that is reasonably relied upon by psychologists in forming opinions. See *supra* ¶¶ 38-40.

¶ 52 In claiming that Dr. Mahoney's testimony was confused and contradictory, defendant also states that Dr. Mahoney was "the lone doctor who disagreed" with defendant's experts. This is in essence a numerosity argument: that because he presented more experts supporting his position, they were more credible and the trial court erred in not finding defendant insane. This argument is misplaced. As the trial court aptly noted:

> "Dr. Wahlstrom and Dr. Henry were credible. So, too, however, was Dr. Mahoney. This is not a numerosity determination. Two witnesses testified for the defense that he was legally insane. One witness testified for the State that he was legally sane. The two-to-one split does not mean that the defendant has carried his burden."

If it came down to a mere numbers game, the affirmative defense of insanity would boil down to a contest of who could retain more experts, rather than an actual evaluation of the merits of the defense.

¶ 53 It is the responsibility of the trier of fact to resolve conflicts in the testimony and weigh the evidence; it is not our role to reweigh the evidence. *People v. Sauls*, 2022 IL 127732, ¶ 52. We will not substitute our judgment on questions involving the weight of the evidence or the credibility of witnesses. *Id.* In looking at Dr. Mahoney's complete testimony, it is clear that the trial court's finding that defendant was not legally insane was not against the manifest weight of the evidence.

¶ 54    Defendant's second contention is that Dr. Mahoney is biased towards the State. Defendant, in his brief, states that "[Dr. Mahoney] is an experienced, paid witness ***." Defendant further states that Dr. Mahoney is "blinded by his bias" in not recognizing command hallucinations in defendant. Ironically, defendant fails to acknowledge that both of his retained experts were experienced and paid witnesses (see *supra* ¶¶ 25, 30). In any case, it is axiomatic that bias impacts the credibility of a witness. Credibility determinations are solely within the province of the trier of fact. *John Crane Inc. v. Allianz Underwriters Insurance Co.*, 2020 IL App (1st) 180223, ¶ 20. We will not disturb the trial court's credibility findings unless they are against the manifest weight of the evidence. *Id.* Here, we cannot find that the trial court's determination that Dr. Mahoney was a credible witness was against the manifest weight of the evidence. The trial court heard all of the evidence, including that Dr. Mahoney was paid by the State and has experience as an expert witness. The trial court also heard that Dr. Mahoney was an expert in forensic psychology and found him qualified to render an opinion on the issue of insanity. Dr. Mahoney's opinion was also based on reliable data. See *supra* ¶¶ 37-40.

¶ 55    Further, it is well established that a trier of fact may accept one expert's testimony over another, so long as the accepted opinion is based on a credible diagnosis. *Plackowska*, 2020 IL App (2d) 171015, ¶ 49 (quoting *McDonald*, 329 Ill. App. 3d at 946). It follows then that a trier of fact may determine that conflicting expert testimony has equal weight, so long as all experts based their testimony on a credible diagnosis. Here, as discussed above, Dr. Mahoney's diagnosis was based on credible data and was substantially similar to the diagnoses given by the other experts. All three experts diagnosed defendant with bipolar disorder, and both Dr. Henry and Dr. Mahoney also diagnosed defendant with a cannabis use disorder. Dr. Mahoney disagreed with both Dr. Wahlstrom and Dr. Henry that defendant was experiencing command hallucinations, but that

disagreement was rooted in reliable data. See *supra* ¶¶ 38-40. It was not arbitrary, and therefore the trial court's finding that Dr. Mahoney's testimony was equally credible to that of Dr. Wahlstrom and Dr. Henry was not against the manifest weight of the evidence.

¶ 56    It is clear that the trial court carefully considered all factors, including potential bias of witnesses, in reaching its conclusion that Dr. Mahoney was credible and that defendant was not legally insane at the time of the incident. We therefore reject this argument.

¶ 57    Defendant's third contention is that Dr. Mahoney violated Rule 9.01 of the APA Code. In his brief, defendant cites Rule 9.01(c) of the APA Code, but quotes language from Rule 9.01(b). Rule 9.01(b) reads as follows:

> "(b) Except as noted in 9.01c, psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions. When, despite reasonable efforts, such an examination is not practical, psychologists document the efforts they made and the result of those efforts, clarify the probable impact of their limited information on the reliability and validity of their opinions, and appropriately limit the nature and extent of their conclusions or recommendations." Am. Psychological Ass'n, *supra*, at 13.

Rule 901(c) reads as follows:

> "(c) When psychologists conduct a record review or provide consultation or supervision and an individual examination is not warranted or necessary for the opinion, psychologists explain this and the sources of information on which they based their conclusions and recommendations." *Id.*

Defendant emphasizes the fact that Dr. Mahoney did not meet with defendant personally, claiming that this failure both violates the APA Code and renders his opinion unreliable. We do not find

that any such ethical violation occurred. The plain language of Rule 9.01(b) carves out an exception for the circumstance in Rule 9.01(c)—record reviews. Here, that is exactly what Dr. Mahoney did. He conducted a thorough record review and provided an opinion based on that. He explained why he thought an examination of defendant was unnecessary, and he also thoroughly explained the sources he relied on in rendering his opinion. See *supra* ¶¶ 38-39. It does not appear as though any ethical violation has occurred.

¶ 58 In effect, defendant here is claiming that the basis of Dr. Mahoney's opinion is faulty, since he did not meet with defendant personally. However, it has been held that both doctors and psychiatrists testifying at trial can give an opinion without having met personally with a defendant, so long as that opinion is based on facts or data that are reasonably relied upon by experts in that particular field. See *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981); *People v. Eckhardt*, 156 Ill. App. 3d 1077, 1094 (1987) (citing *People v. Newbury*, 53 Ill. 2d 228, 236 (1972), and *People v. Smith*, 93 Ill. App. 3d 26, 34 (1981)). The same is true of psychologists. Further, any weakness in the basis of an expert's opinion goes to weight, not admissibility. *People v. Comier*, 2020 IL App (1st) 170500, ¶ 83 (citing *People v. Lind*, 307 Ill. App. 3d 727, 739 (1999)). The trial court was not required to disregard Dr. Mahoney's opinion merely because he did not meet personally with defendant. This is true even if Dr. Mahoney violated the APA Code. Finally, even if Dr. Mahoney's failure to meet with defendant personally violated the APA Code, that violation would not compel a reversal in this case.

¶ 59 As a final note, defendant consistently discusses the credibility of the experts and how the trial court should have found defendant's experts more credible than Dr. Mahoney. However, that is not a proper argument, given the standard of review.

"[I]t is not sufficient that there is evidence to support defendant's argument or even that, were we the trier of fact, we would have found clear and convincing proof of insanity. The standard by which we must review the trial court's denial of defendant's affirmative defense is whether its decision was against the manifest weight of the evidence. We will not substitute our judgment for the trial court's regarding the weight of the evidence, the credibility of the witnesses, or the inferences to be drawn from the evidence." *People v. McCullum*, 386 Ill. App. 3d 495, 505 (2008).

It does not matter that defendant thinks his experts were more credible than the State's and that evidence exists within the record to support his affirmative defense. Although there was conflicting expert testimony, there was sufficient evidence for the trial court to conclude that defendant was not legally insane at the time of the offense. Accordingly, we do not find that the trial court's finding was against the manifest weight of the evidence.

¶ 60    We now address defendant's second and final contention—that section 11-501(a)(7) of the Vehicle Code violates the equal protection clause of the Illinois and United States Constitutions. Defendant claims that subsection (a)(7) violates equal protection because it treats lawful users of "personal cannabis" differently. Under subsection (a)(7), users without a valid registry card are presumed intoxicated if, within two hours of driving or being in actual physical control of a motor vehicle, they have a THC concentration of either 5 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of whole blood or 10 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of other bodily substance. 625 ILCS 5/11-501.2(a)(6) (West 2020). The State must prove intoxication for users charged under subsection (a)(7) who possess a valid registry card, regardless of THC level. Defendant's argument fails at its inception, as he cannot establish that he is similarly situated to the comparison group.

¶ 61    "The constitutionality of a statute presents a question of law, which is reviewed *de novo*." *In re M.A.*, 2015 IL 118049, ¶ 21. Statutes are presumed to be constitutional; the party challenging the statute has the burden of establishing a clear constitutional violation. *People v. Baker*, 2020 IL App (2d) 181048, ¶ 9 (citing *People v. One 1998 GMC*, 2011 IL 110236, ¶ 20). Equal protection analysis is the same under both the United States and Illinois Constitutions. *People v. Shephard*, 152 Ill. 2d 489, 499 (1992). The fourteenth amendment to the United States Constitution provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. Article I, section 2, of the Illinois State Constitution provides: "No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2.

¶ 62    "Generally, equal protection requires the government to treat similarly situated people in a similar manner." *People v. Donoho*, 204 Ill. 2d 159, 176-77 (2003). However, equal protection does not forbid all classifications; rather, it prevents the legislature from treating *similarly situated* individuals differently. *M.A.*, 2015 IL 118049, ¶ 25 (citing *In re Derrico G.*, 2014 IL 114463, ¶ 92). To be similarly situated for purposes of equal protection, individuals must be alike in all relevant aspects. *Id.* Determining if individuals are similarly situated requires an analysis of the purpose of the legislation at issue. *Id.* ¶ 26. If a party fails to show that he or she is similarly situated to the comparison group, the equal protection argument fails. *Id.*

¶ 63    Additionally, distinctions between similarly situated persons in a class can be made, so long as the distinction is proper. *People v. Dean*, 363 Ill. App. 3d 454, 463-64 (2006). For a nonsuspect class, as defendant concedes is the case here, rational-basis review applies. *Id.* at 464. Under rational-basis review, a statute passes constitutional muster if the statute has a rational

relationship to a legitimate purpose and is neither arbitrary nor discriminatory. *Donoho*, 204 Ill. 2d at 177.

¶ 64    Our first step in the equal protection analysis is to determine if defendant, as an individual charged under subsection (a)(7) who used cannabis without a valid registry card, is similarly situated to the comparison group, cannabis users with a valid registry cards. As an initial note, defendant failed to provide any analysis detailing how the two groups that subsection (a)(7) creates are similarly situated. As the State remarked, the reviewing court " 'is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research.' " *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 69 (quoting *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010)). Failure to properly raise and develop an argument results in forfeiture of that argument. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 65    Forfeiture aside, defendant's position appears to be that lawful users of cannabis without a valid registry card are similarly situated to lawful users of cannabis with a valid registry card, because both groups can legally use cannabis for personal or recreational use, yet users without a valid registry card are subjected to a *per se* intoxication standard under subsection (a)(7) while users with a valid registry card are not. In order to assess whether these two groups are similarly situated, we must examine the relative positions of each group in light of the broad purpose and operation of the statute.

¶ 66    Section 11-501 of the Vehicle Code was enacted to keep impaired drivers off the road. *People v. Fate*, 159 Ill. 2d 267, 269 (1994); *People v. Minor*, 2019 IL App (3d) 180171, ¶ 20. Effective July 1, 1990, the legislature added a subsection, which prohibited driving with any amount of cannabis in one's system "resulting from the unlawful use or consumption of cannabis."

Pub. Act 86-1019 (eff. July 1, 1990) (adding Ill. Rev. Stat. 1991, ch. 95½, ¶ 11-501(a)(5)). This subsection was moved from subsection (a)(5) to subsection (a)(6) in January 1999. Pub. Act 90-779 (eff. Jan. 1, 1999) (amending 625 ILCS 5/11-501).

¶ 67    The Illinois legislature later enacted the Compassionate Use of Medical Cannabis Pilot Program Act (Pub. Act 98-122 (eff. Jan. 1, 2014) (adding 410 ILCS 130/1 *et seq.*)), which authorized the use of cannabis for medical purposes. In doing so, the legislature acknowledged the beneficial uses of cannabis in treating certain illnesses. 410 ILCS 130/5 (West 2014). With the legalization of medical cannabis, section 11-501 of the Vehicle Code was also amended to account for the new developments in cannabis law. The following sentence was added to subsection (a)(6):

> "Subject to all other requirements and provisions under this Section, this paragraph (6) does not apply to the lawful consumption of cannabis by a qualifying patient licensed under the [Medical Cannabis Act] who is in possession of a valid registry card issued under that Act, unless that person is impaired by the use of cannabis." Pub. Act 98-122 (eff. Jan. 1, 2014) (amending 625 ILCS 5/11-501(a)(6)).

Though the Medical Cannabis Act legalized cannabis for medical use, it explicitly did not permit any individual to operate a vehicle while under the influence of cannabis. 410 ILCS 130/30(a)(5) (West 2014).

¶ 68    Effective July 2016, subsection (a)(7) was added to section 11-501(a) of the Vehicle Code. It prohibited an individual from driving or being in actual physical control of a vehicle if "the person has, within 2 hours of driving or being in actual physical control of a vehicle, a [THC] concentration in the person's whole blood or other bodily substance as defined in paragraph 6 of subsection (a) of Section 11-501.2 of this Code." Pub. Act 99-697 (eff. July 29, 2016) (amending 625 ILCS 5/11-501(a)). The newly added subsection (a)(6) of section 11-501.2 of the Vehicle

Code reads as follows: "[THC] concentration means either 5 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of whole blood or 10 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of other bodily substance." Pub. Act 99-697 (eff. July 29, 2016) (amending 625 ILCS 5/11-501.2). Another newly added subsection reads as follows: "If there was a [THC] concentration of 5 nanograms or more in whole blood or 10 nanograms or more in an [*sic*] other bodily substance as defined in this Section, it shall be presumed that the person was under the influence of cannabis." *Id.*

¶ 69    In June 2019, the legislature enacted the Cannabis Regulation and Tax Act (Pub. Act 101-27 (eff. June 25, 2019) (adding 410 ILCS 705/1-1 *et seq.*)), which legalized recreational use of cannabis for individuals over 21 years of age, effective January 1, 2020. In so enacting, the legislature found that cannabis should be regulated in a manner similar to alcohol. This act did not amend section 11-501(a) of the Vehicle Code.

¶ 70    The precise issue of whether cannabis users with a valid registry card are similarly situated to those without was recently discussed by the Fourth District in *People v. Lee*, 2023 IL App (4th) 220779. In *Lee*, the defendant was found guilty at a bench trial of aggravated driving under the influence of cannabis and was sentenced to six years in prison. *Id.* ¶ 1. On appeal, the defendant argued that section 11-501(a)(7) of the Vehicle Code violated the equal protection clause of both the Illinois and United States Constitutions. The appellate court disagreed, finding that card-holding medical cannabis users were not similarly situated to noncard holders because, in order to obtain a valid registry card, an individual must suffer from certain debilitating medical conditions (410 ILCS 130/10(t) (West 2020)) and have a physician's certification (*id.* § 55(a)(1)). *Lee*, 2023 IL App (4th) 220779, ¶ 46.

¶ 71    Although recreational cannabis was illegal at the time of the accident in *Lee*, we find the Fourth District's analysis to be instructive. Under the Medical Cannabis Act, in order to be registered as a qualifying patient, an individual must meet the following requirements: (1) submit a completed application[5]; (2) submit a written certification from a health care professional within 90 days of submitting the application certifying that (a) the individual is suffering from a debilitating medical condition as defined by the Medical Cannabis Act and (b) the certifying health care professional is treating or managing treatment of that condition; and (3) pay a registry card fee. 410 ILCS 130/55(a) (West 2020). In certain instances, an individual may be required to produce medical documentation related to his or her debilitating condition. *Id.* § 55(a)(2).

¶ 72    Given the significant number of prerequisites in order to obtain a valid registry card, defendant cannot establish that he is similarly situated to individuals with a valid registry card. Users without a valid registry card, such as defendant, have not established any debilitating medical conditions or that they are receiving ongoing treatment by a health care professional. Additionally, under the Medical Cannabis Act, users with a valid registry card are presumed to be engaged in the medical use of cannabis so long as the amount of cannabis they possess does not exceed the amount allowed by subsection (a) of section 10 of the Medical Cannabis Act. See *id.*

---

[5]The application requires personal information such as name, address, date of birth, last four digits of social security number, phone number, and e-mail address. An applicant is also required to provide proof of identity in the form of a state driver's license, state ID card, passport, or other form. See *Qualifying Patient Application Instructions*, Ill. Dep't of Pub. Health, https://dph.illinois.gov/topics-services/prevention-wellness/medical-cannabis/patient-application-instructions.html (last visited Mar. 12, 2024) [https://perma.cc/ZFW4-C4PR].

§ 25(d)(1). Even if that presumption is rebutted and an individual with a valid registry card is deemed to be using cannabis recreationally, that does not change the fact that they are simultaneously receiving ongoing treatment from a health care professional. This distinguishes them from recreational users without a valid registry card, such that an equal protection claim fails.

¶ 73 This distinction also fits within the broad purpose and operation of the statutes at issue here. Section 11-501(a) of the Vehicle Code, the Medical Cannabis Act, and the Cannabis Regulation and Tax Act each have different legislative purposes. Section 11-501(a) of the Vehicle Code was enacted to keep impaired drivers off the road. *Fate*, 159 Ill. 2d at 269; *Minor*, 2019 IL App (3d) 180171, ¶ 20. In achieving this purpose, courts have found that *per se* impairment statutes are constitutional. See *People v. Ziltz*, 98 Ill. 2d 38, 42-43 (1983) (finding that statute imposing strict liability on drivers found to be impaired by an alcohol concentrate of 0.10% or above did not violate the United States Constitution). The Medical Cannabis Act legalized cannabis for medical use and acknowledged the benefits of cannabis when used for medical purposes. See 410 ILCS 130/1 *et seq.* (West 2020). And the Cannabis Regulation and Tax Act legalized the use of cannabis for recreational use and found that it should be treated similarly to alcohol in the eyes of the law. See 410 ILCS 705/1-1 *et seq.* (West 2020). In order to balance those competing interests, the legislature deemed it appropriate to treat individuals with a valid registry card differently from those without a valid registry card to achieve goals of both traffic and road safety and allowing individuals to benefit from the medical properties of cannabis. The creation of these two groups helps to serve the broader purposes of the legislature, and, accordingly, valid registry cardholders are not similarly situated to non-cardholders.

¶ 74 Even if the two groups were similarly situated, defendant's argument fails because there is a rational basis for treating the groups differently. Defendant's rational basis argument revolves

solely around the Cannabis Regulation and Tax Act. See *id.* § 1-5(a). He argues that the purposes of the act is are to help law enforcement focus on non-cannabis crimes and so the State can generate revenue for social programs, but these purposes are not furthered by treating valid registry card holders differently from non-cardholders under section 11-501(a)(7) of the Vehicle Code.

¶ 75    Defendant's reliance solely on the Cannabis Regulation and Tax Act is misplaced. The statute at issue here, section 11-501(a)(7) of the Vehicle Code, is designed to keep impaired drivers off the road. *Fate*, 159 Ill. 2d at 269; *Minor*, 2019 IL App (3d) 180171, ¶ 20. This purpose has been held to be a legitimate State interest (*Fate*, 159 Ill. 2d at 271), and courts have routinely upheld the constitutionality of similar *per se* impairment statutes. See, *e.g.*, *Ziltz*, 98 Ill. 2d at 42-43. When the Medical Cannabis Act was passed, the legislature explicitly carved out an exception for valid registry cardholders in subsection (a)(7). This exception is not arbitrary, as it is rationally related to achieving the legitimate State interests of both traffic and road safety and allowing individuals to benefit from the medical properties of cannabis.

¶ 76    The legislature's treatment of cannabis is also similar to the legislature's treatment of prescription medication. Driving after consuming prescription medication is not illegal; rather, a lawful user of prescription medication may drive so long as his or her prescribed medication does not render him or her incapable of driving. *People v. Vente*, 2012 IL App (3d) 100600, ¶ 12 (citing *People v. Rodriguez*, 398 Ill. App. 3d 436 (2009)). Similarly, here, a lawful user of cannabis with a valid registry card may drive after consuming cannabis, so long as it does not render him or her incapable of driving. This satisfies both purposes of traffic and road safety and allowing individuals to benefit from the medical properties of cannabis.

¶ 77    As defendant failed to establish that he is similarly situated to the comparison group and that section 11-501(a)(7) does not have rational relationship to a legitimate purpose that is neither arbitrary nor discriminatory, we reject defendant's second contention.

¶ 78    There is no denying the tragedy of this case. It is clear from the record that defendant was suffering from a mental illness at the time of the incident. However, this does not absolve defendant; he must bear the consequences of his actions.

¶ 79                                  III. CONCLUSION

¶ 80    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 81    Affirmed.

*People v. Bishop*, **2024 IL App (2d) 230106**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 20-CF-451; the Hon. Michael E. Coppedge, Judge, presiding. |
| **Attorneys for Appellant:** | Matthew J. Haiduk, of Haiduk Law, P.C., of Geneva, for appellant. |
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and Pamela S. Wells, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |