NOTICE
Decision filed 05/16/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 210098-U

NO. 5-21-0098

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-CF-3135 |
| | ) | |
| DONALD M. NELSON, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding that defendant was legally sane at the time of the offense was not manifestly erroneous where an expert and other evidence supported the circuit court's determination.

¶ 2    Defendant, Donald M. Nelson, appeals his convictions, arguing that the circuit court erred in failing to find him not guilty by reason of insanity. For the reasons below, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4    On October 16, 2018, Eldon Williams was found dead in his car on West Delmar Avenue in Alton, Illinois. In a separate incident that same day, it was reported that a man had unlawfully entered a residence on 9 Rosa Avenue, Godfrey, Illinois. In connection with these crimes, defendant was indicted on three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2018)), attempted armed robbery (*id.* § 18-2(a)(2)), criminal trespass to a residence (*id.* § 19-

1

4(a)(2)), armed violence (*id.* § 33A-2(a)), unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)), and possession of a stolen firearm (*id.* § 24-3.8(a)). On September 28, 2020, the first degree murder count based on felony murder and the attempted armed robbery count were dismissed.

¶ 5     On June 13, 2019, the circuit court held a fitness hearing and noted that it received Dr. Cuneo's fitness report, which found that defendant was malingering and was fit to stand trial. After speaking with defendant, the circuit court stated defendant was a mild-mannered speaking individual, respectful in his responses to the circuit court, and able to relate past events. The circuit court also noted that defendant understood the responsibilities of the individuals in the courtroom, understood his rights with regard to the trial, and asked appropriate questions. The circuit court found that defendant was able to assist his attorney in his defense and was fit to stand trial.

¶ 6     The case proceeded to a bench trial on September 29, 2020. The defense's theory at trial was that defendant was not guilty by reason of insanity.

¶ 7     The State first called William Groppel to testify. Groppel stated that he knew Williams for 50 years and asked Williams to sell his sister-in-law's house. On October 16, 2018, they were to meet at 211 West Delmar to give Williams the keys to the house and place a sign in the yard. They were to meet around 11 a.m. When Groppel first arrived at the house, Williams had not yet arrived. Groppel then went to a nearby Home Depot and did some shopping. Upon Groppel's return to the house around 20 to 30 minutes later, he saw Williams's car in the driveway. Groppel saw Williams sitting in the driver seat of his vehicle with the door open and leaning over as if he was getting something out of the ashtray or glove box. Once Groppel got to the car, he saw a "black hole in the back of his head" and "blood was trickling down the side of it." Groppel checked for a pulse. When he realized Williams did not have a pulse, he went back to his car and called 9-1-1.

2

¶ 8    Michael Roderfeld, a detective for Alton Police Department, testified that he responded to a 9-1-1 call at 211 West Delmar on October 16, 2018. Detective Roderfeld identified a map of the area and stated that Walgreens, CVS, Imo's Pizza, and Liberty Bank were generally in the area of West Delmar. Alton Police Department had jurisdiction over this area. He then identified nearby Rosa Avenue and stated My Time Day Spa, Carver's BBQ, and Mister Donut were generally in that same vicinity. Madison County Sheriff's Office had jurisdiction over that area. Detective Roderfeld stated he determined Eldon Williams was the victim using the realty sign in the front yard of the house, as it had the picture of Williams on it. He kept the scene secured until the investigator arrived.

¶ 9    Illinois State Police crime scene investigator, Grant Hentze, testified that on October 16, 2018, he responded to a call informing him of the death of Williams. Upon arrival, he observed a red Lincoln sedan parked in the driveway with "the rear driver's side door and the driver's door" open. The victim was positioned in the front seat slumped over the center console. Investigator Hentze identified State's exhibit Nos. 22-41 as the photographs he took of the scene and the circuit court admitted them into evidence. He also identified State's exhibit No. 8 as the projectile he collected from the interior panel of the front passenger door of the vehicle. In reference to State's exhibit No. 41, Investigator Hentze testified it was a picture of a discharged cartridge case found just north of the rear passenger corner of the vehicle. He stated the brand of ammunition the cartridge came from was Perfecta, 9-millimeter Luger. Investigator Hentze stated Perfecta was not a common ammunition brand. He also testified that on the following day, he attended the autopsy of Williams and the doctor who examined Williams believed the bullet entered the rear of the head and exited through the front.

3

¶ 10    Kara Conrad, an employee at My Time Day Spa, testified that she worked at 13 Rosa Avenue. Around 10:30 a.m. on October 16, 2018, she was working when she observed a man peering into the spa's window. The man walked away but came back some time later and was asking spa clients in the parking lot if he could use their phone. Conrad testified the man was a young, black male between 5'10" and 6'2" in height, with short dreadlock hair. She stated the man had a large camouflage backpack and was wearing light-colored jeans. After she realized the man was asking the spa's clients to use their phones, she called the sheriff's department. On cross-examination, Conrad admitted that she found the man's conduct "unsettling," to the point where she locked the doors of the spa. She agreed she told officers that the man peering in the window looked past her as if he "was just looking into the space."

¶ 11    Stuart Mehl testified that he lived with Cindy Pratt at 9 Rosa Avenue. On October 16, 2018, he was sitting in the living room and Pratt was in the kitchen when he heard the front door open. He turned around to a man standing behind him. Mehl testified the man was black and in his 30s wearing a "beanie cap" on his head. Mehl asked the man what he wanted, and the man said nothing. Mehl then told the man to leave, and Pratt picked up a billy club and threatened to throw it at the man. The man came further into the home, and Pratt yelled at him, asking him what he wanted. The man said he wanted food. Mehl told the man they did not have any food and to "get out." Pratt then said she was going to get their dog, who was in the backyard, and the man went outside. Mehl testified he called 9-1-1 when the man went outside but stated the man did not leave the front yard right away. Mehl stated that he was "shocked" when this man came into his home. Mehl further testified that when he yelled at the man to get out, the man responded, saying, "Where am I?" Mehl admitted that the man never threatened him, never stated he needed a vehicle, never said he needed a hideout, and never indicated he had a gun.

4

¶ 12    Cynthia Pratt also testified, relaying substantially the same story as Mehl. Pratt further stated the man that entered their home was a tall, black man with a lot of hair wearing a white shirt. On cross-examination, Pratt stated she did not remember telling officers that the man asked, "where am I?" when he first entered their home. She agreed that the man did not stop her from getting her dog, ask for money, ask for a vehicle, or tell her he needed somewhere to hide. He did not tell her he had a gun. Pratt stated that when she returned with her dog, the man had left the house and was standing at the foot of the stairs on the porch outside, looking up towards the closed front door.

¶ 13    Detective Robert Weller of the Madison County Sheriff's Office testified that around 11:30 a.m. on October 16, 2018, he and his partner, Detective Tim Lawrence, received a call from dispatch regarding a suspicious subject at My Time Day Spa on 13 Rosa Avenue. Seconds later, they received another call from dispatch regarding a subject entering a residence on 9 Rosa Avenue. The subject was described as a black male wearing a white shirt, ball cap, and backpack. Detective Weller testified they were within two to three miles of Rosa Avenue and decided to proceed in that direction to assist other deputies in trying to locate the individual. Within a few minutes, they arrived in the area and observed a man matching the description walking westbound on West Delmar. At the same time, they saw another deputy pulling up to that individual. As soon as contact was made, the subject ran away on foot. Detective Weller observed the subject run through yards and properties heading eastbound. Eventually, the detectives exited the car and Detective Weller was located approximately 30 feet from the subject, who was unaware of his presence. Detective Weller announced his presence and commanded the subject to get on the ground. The subject stopped running but did not otherwise comply. Detective Weller then advanced toward the subject until he made physical contact with him and grabbed the subject's

hands to arrest him. The subject pulled his hands toward his front right pocket region, which concerned Detective Weller. About that time, Detective Lawrence arrived. While attempting to arrest the subject, Detective Weller fell on top of the subject. Detective Weller was then able to secure him in handcuffs. When Detective Weller asked the subject why he ran, the subject stated he had a gun on him. A 9-millimeter handgun was located in the subject's front right pocket. Detective Weller testified he learned the identity of the subject was defendant.

¶ 14 Detective Weller stated that after reading defendant his *Miranda* rights, defendant stated that he found the gun earlier in the morning on the ground in Salu Park in Alton. Defendant initially denied going into the residence on Rosa Avenue but, upon further questioning, admitted entering the residence to look for something to drink. Defendant told Detective Weller that a woman in the house had "some sort of a weapon" and told him to leave, at which point he left. Once Detective Weller learned this information, defendant said he was thirsty and wanted a drink. Detective Weller gave him a bottle of water. Detective Weller then placed defendant in Deputy Patterson's squad car to be transported to the Madison County jail.

¶ 15 Detective Weller testified that he had previously encountered individuals who were seriously mentally ill during his 14 years with the Madison County Sheriff's Department. He said whenever he felt like someone was mentally ill, there were protocols to follow and he typically transported them to Gateway Regional Hospital or went straight to a place with trained personnel to properly evaluate them, such as Alton Memorial Hospital or St. Anthony's Hospital. Detective Weller testified he had no concerns with defendant's mental status and decided to transport him to the Madison County jail. While Deputy Patterson transported defendant to the jail, Detective Weller headed toward 9 Rosa Avenue to speak with the residents. Detective Weller stated that prior to arriving at the Rosa residence, Sergeant Keshner—who was at 211 West Delmar—called

6

him and stated a subject had what appeared to be a gunshot wound to the back of his head and a 9-millimeter shell casing was located on the ground. Detective Weller testified that due to the close proximity of where he came in contact with defendant, the shell casing was potentially related to the 9-millimeter handgun that the subject had on his person.

¶ 16 On cross-examination, Detective Weller agreed he had no mental health training outside that completed through the regular police academy. He estimated his encounter with defendant was approximately 30 minutes from start to finish.

¶ 17 Detective Tim Lawrence of the Madison County Sheriff's Office provided substantially similar testimony as Detective Weller regarding the arrest of defendant and their actions after defendant was placed in Deputy Patterson's squad car to be transported to jail. He further stated that after defendant was arrested, defendant said that he just picked up a gun. Detective Lawrence searched defendant and found a SCCY semiautomatic 9-millimeter in his front right pocket. Detective Lawrence testified a magazine was in the gun with unspent rounds in it. He stated the unspent rounds were the brand, Perfecta. He then attempted to make the firearm safe by locking the slide back, and when he did so, an unspent round was ejected, which meant the firearm was loaded. Detective Lawrence ran the gun's serial number through the databases, and it returned a result that the gun was stolen from Alton. Detective Lawrence identified State's exhibit No. 6 as the gun he found on defendant. He testified that in addition to the gun, he found another unspent 9-millimeter round of the Perfecta brand in defendant's front right pocket. In the other pocket, he found another Perfecta unspent round, some U.S. currency, and a couple of pill bottles.

¶ 18 Sergeant Andrew Pierson of the Alton Police Department was also involved in the investigation of the murder of Williams. He testified that when he arrived at the scene, he observed a red Lincoln car with the door open and an elderly male deceased in the driver's seat. While at

the scene, Sgt. Keshner, a Madison County sheriff's deputy, drove by and informed Pierson that a suspect had been arrested who may be of interest due to an incident "a few blocks away." Detective Pierson testified that he and Detective Siatos left the scene to meet Deputy Patterson and his partner at a Dollar Tree parking lot to speak with the suspect. He stated the suspect was of interest due to the close proximity of the other incident to the crime scene and that the suspect had a 9-millimeter semiautomatic handgun in his possession. When they arrived at the parking lot, an ambulance was preparing to take defendant to the hospital because he vomited. Sergeant Pierson stated that he took the property found on defendant to the Alton Police Department, and Detective Siatos rode in the ambulance with defendant. Sergeant Pierson testified that after taking the property to the police department, he went to the hospital where defendant was being seen. Defendant was at the hospital for about five hours, and when he was medically cleared, he was taken to the Alton Police Department. He stated there was nothing about defendant's release that caused him any concern about interviewing defendant and there was nothing indicating any doctor saw any psychiatric concerns.

¶ 19    Once defendant was returned to the Alton Police Department, Sergeant Pierson stated that he and Detective Siatos conducted a recorded, formal interview with defendant. Sergeant Pierson had participated in hundreds of interviews during his time in investigations. He testified that defendant never mentioned hearing voices or anything like Illuminati.[1] He also did not notice anything out of the ordinary that caused him concern about defendant's psychiatric well-being. He stated defendant responded to their questions and never stated that he did not understand. Sergeant Pierson testified that during the interview, defendant reenacted the murder. He stated that there have been other occasions where he had concerns about an individual's psychiatric well-being

---

[1]"Illuminati" refers to an entity defendant claims exercised some form of control over him.

when speaking to them but did not have any concerns about defendant. Sergeant Pierson testified that defendant indicated to him that defendant killed Williams on purpose; he planned it, and he experienced a rush. Defendant also told Sergeant Pierson that he would do it again if he had the opportunity.

¶ 20    Based on witness statements that placed defendant in the area, Detective Kimberly Lutman testified that on October 16, 2018, she was tasked with going to the Walgreens located on State Street to determine if there was video surveillance footage that might be helpful to the investigation into Williams's death. She found video surveillance of defendant being at Walgreens around 10:58 a.m. She stated the scene of Williams's death—211 West Delmar—was east of the Walgreens and .2 miles away. If walking, it would take about five minutes to arrive at 211 West Delmar from the Walgreens. Detective Lutman testified that the video showed defendant wearing a hat, camouflage backpack, gray shirt, and jeans. Defendant left the Walgreens parking lot at 11:01 a.m. in the direction of West Delmar. Detective Lutman further testified that on October 17, 2018, she confirmed with the Illinois Department of Corrections that defendant was on parole as of that date.

¶ 21    The parties stipulated to the report of Thomas Gamboe, a forensic scientist, which concluded the casings found at the crime scene were fired from the gun found on defendant. They also stipulated to a certified copy of defendant's 2016 conviction for unlawful delivery of a controlled substance.

¶ 22    Keitra Hinton testified that she lived in Alton, Illinois, in 2016 and owned a 9-millimeter firearm. She stated that State's exhibit No. 6 looked exactly like the firearm that she reported stolen in 2016. She stated that the Alton Police Department informed her that they found her gun after a murder occurred in Godfrey. Hinton testified that she knew defendant and she did not give him

9

permission to have her gun. During cross-examination, Hinton stated that defendant was in her car in 2016, and her gun was stolen from the car.

¶ 23    Deputy Ben Patterson testified that on October 16, 2018, at around 11:35 a.m., he received a report of a suspicious subject at a day spa on 13 Rosa Avenue, Godfrey, Illinois. The subject was described as a black male with a backpack. He was "hanging around the front of the store," looking inside the windows, asking a client to use the phone. While Deputy Patterson was on his way to the spa, he learned of another call regarding criminal trespass to a residence on 9 Rosa Avenue and that the subject was a black male with a gray shirt and a hat. When Deputy Patterson arrived in the area at 11:43 a.m., he saw a black male with a backpack and a hat. He pulled over and attempted to make contact, but the subject started running away. Deputy Patterson stated that he eventually lost sight of the subject and radioed the subject's direction. The subject was defendant, who was eventually apprehended.

¶ 24    When Deputy Patterson arrived at the location where defendant was taken into custody, defendant was in handcuffs and put in the back of Deputy Patterson's patrol car. Defendant's property was also placed in Deputy Patterson's patrol car. As Deputy Patterson transported defendant to Madison County jail, defendant complained he was getting sick and needed water. Defendant vomited and Deputy Patterson pulled into the Dollar Tree parking lot. While they awaited the EMS, Deputy Thatcher, Detective Weller, and Detective Lawrence, as well as Alton Police Department officers, arrived and informed Deputy Patterson that defendant was a possible homicide suspect. When the EMS arrived, they examined defendant and transported him to Alton Memorial Hospital due to an elevated heart rate.

¶ 25    James Siatos, a detective for the Alton Police Department, testified that he was assigned to investigate the murder of Eldon Williams. On October 16, 2018, he went to the crime scene at 211

10

West Delmar Avenue, Alton, Illinois. Medical personnel advised they were unable to perform any life-saving techniques on the deceased. He was also informed by a deputy that an incident had just been reported a couple blocks away and Alton police officers had a suspect in custody who they believed could be related to the death of Williams. Upon receiving that information, Detective Siatos and his partner, Detective Pierson, went to a parking lot where Deputy Patterson had defendant in custody. At that time, defendant's property was released to Detective Pierson and defendant was transported by ambulance to Alton Memorial Hospital. Detective Siatos and Deputy Patterson both rode in the back of the ambulance to the hospital. Detective Siatos stated a psychiatric evaluation was not the purpose of the hospital visit. Once defendant was medically cleared, he was transported to the Alton Police Department and placed in an interview room, where defendant received food and drink. Detective Siatos received no information from medical staff that gave him any concern about conducting defendant's formal interview. He further stated that nothing during the time he rode with defendant to the hospital or while they were at the hospital gave him concern about defendant's psychiatric well-being.

¶ 26     Detective Siatos stated that he and Detective Pierson interviewed defendant for a little less than two hours. During that time, there was nothing that caused him to be concerned about defendant's psychiatric well-being. He stated that defendant spoke clearly and gave responses indicating that he understood their questions. Detective Siatos testified that defendant did not say anything about hearing voices or the Illuminati during the interview. He identified State's exhibit No. 5 as the video recording of defendant's interview on October 16, 2018. The circuit court admitted the exhibit into evidence and the video was played for the jury.

¶ 27     The beginning of the video showed officers bringing defendant to the interview room. One officer told defendant someone would be in to talk to him soon and if he needed anything to knock

11

on the door. The officer also informed defendant that the room was video and audio recorded at all times and he wanted to tell him that so defendant did not pick his nose or embarrass himself on camera. Immediately after the officer left and closed the door, defendant looked directly at the camera, stuck his finger in his nose, and swirled it around. In his interview, defendant initially denied being in the area, but eventually admitted being in the area, killing Williams, and entering the house on Rosa. In doing so, defendant said it was not an accident, and he planned to kill Williams because "it felt right" and it seemed like Williams would do it to him. Later in the interview, defendant also said he shot Williams because the car's color was red like blood, Williams looked evil, and Williams looked like he would do it to him. He said he thought about taking the car, but he did not want to get blood on him.

¶ 28    Defendant also stated in the video that after the shooting he went to the house on Rosa. He agreed he went to the house because he thought no one was home and he could "duck down" there. When officers asked how he felt after the shooting, defendant said, "Perfecta." Defendant stated he would want to do it again because it gave him a rush. The officers asked why defendant did not shoot the people in the Rosa house if he got a rush from shooting Williams. Defendant stated that he wanted to be cautious because it was his first time killing someone. Defendant reenacted the crime with one officer acting as Williams. He corrected the officers when they said something incorrectly about how the shooting occurred. Defendant explained that Williams had just sat down in the driver's seat when defendant raised his hand—as if it was a gun—to the back left of the officer's head and said he shot Williams once. Defendant said blood then came out the right front of Williams's head. When defendant was done reenacting Williams's shooting, the officers informed defendant they were going to leave the room for a moment and defendant asked when he could leave. Throughout the video, particularly in the beginning before defendant confessed,

12

defendant often looked away from the officers and looked at a wall or the table when he or the officers spoke.

¶ 29    After the video was presented, Detective Siatos testified that defendant initially denied being in the area of the murder during the interview, but after about an hour and 23 minutes, and being confronted with video surveillance from the local Walgreens, defendant admitted that he was in the area. Detective Siatos further stated that after about 15 more minutes, defendant stated that he went into the house at 9 Rosa Avenue and ultimately admitted to shooting Williams on 211 West Delmar. Detective Siatos agreed that in reenacting how defendant committed the murder, defendant described "how the victim was slumped over in his chair." This description matched the position of Williams's body when it was discovered.

¶ 30    On cross-examination, Detective Siatos testified that he had a minor in psychology but was not a psychiatrist. He stated that he received specialized training in dealing with mentally ill subjects, which included crisis intervention team training and certification as a CIT officer that specialized in mental health. Detective Siatos disagreed that defendant's interrogation and confession could be characterized as one of the most bizarre he had ever conducted. He agreed that even after he admitted shooting Williams, defendant asked for his clothes back and when he could leave several times throughout the interview.

¶ 31    Detective Siatos did not remember correcting defendant and telling him that he got out of the hospital that day but remembered that they discussed defendant being at the hospital. They talked about the medications defendant did and did not receive. Detective Siatos also remembered telling defendant a couple of times that he did not receive any medications at the hospital. Detective Siatos testified that defendant stated he left his bluish pink car at a Domino's, but the police did not locate any such car and were not able to verify whether defendant had a vehicle. Detective

13

Siatos agreed that defendant gave a lot of inconsistent answers and he became frustrated with defendant. When asked if Detective Siatos posed a lot of scenarios to defendant, Detective Siatos stated that he asked a lot of different questions. Defense counsel then asked, "And many times he does eventually agree with one of the scenarios that you pose to him?" Detective Siatos answered that he would say that defendant answered the questions. Detective Siatos agreed that defendant stated a couple of times that he thought Tylenol was making him forget, and Detective Siatos had to remind defendant that he did not have Tylenol in his system. Detective Siatos also agreed that when they questioned defendant about entering the Rosa Avenue house, defendant initially said he did not remember entering the house and mentioned Tylenol as being the reason why he could not remember. Defendant also said he could not remember because it was a long time ago and Detective Siatos had to remind defendant that the incident occurred approximately nine hours earlier.

¶ 32    Detective Siatos agreed that when they finally discussed Williams's shooting, it was fair to say defendant immediately admitted to the shooting. Detective Siatos testified that defendant initially mentioned something about the color of Williams's car in explaining why defendant felt like he had to shoot Williams. Defendant also stated he felt like he had to shoot Williams because it felt right and because defendant felt like Williams looked like somebody who would do that to him. Detective Siatos testified when he asked defendant how it made him feel, defendant's response was "Perfecta," which was the name of the ammunition of the gun found on defendant.

¶ 33    Detective Siatos stated that he was not aware that defendant took any property from Williams. He testified that defendant stated he got a rush when he shot Williams and that he would do it again. Detective Siatos agreed that he did not talk with defendant about the fact that just minutes after the shooting, he walked into an unlocked house on Rosa Avenue, which was

14

occupied by a disabled man who could not get out of his recliner and an elderly woman who was only armed with a club. He also agreed that defendant had a loaded gun in his pocket at that time. Detective Siatos testified that he was familiar with defendant through his work in narcotics and he did not recall a time when defendant acted in a violent manner.

¶ 34    On redirect examination, Detective Siatos testified that it was not uncommon for people to lie during an interview, and it was very common for people to say they forgot or did not remember something as a way of avoiding answering a question. When asked what Detective Siatos believed defendant meant when he kept asking for his clothes back, Detective Siatos stated that it was not uncommon for a suspect to want to leave, because they do not really know they are in trouble and part of leaving is taking your things with you. He explained that often the request is a sign of them asking if they can leave. When asked if there was anything about defendant staring at the map during the interview that would identify as a vacant stare or cause any concern about his psychological well-being, Detective Siatos stated he believed it appeared defendant was just thinking about his answer to the detectives' questions when defendant stared at the map. Detective Siatos stated that he asked defendant why he did not also kill the residents of the Rosa Avenue house after he killed Williams, and defendant replied that he was being cautious and stated it was his first time. Detective Siatos stated there was nothing in the interview that he would categorize as bizarre. He again testified that defendant's reenactment of the shooting was consistent with the evidence that was found at the scene, including the positioning of Williams. On recross-examination, Detective Siatos agreed that he believed defendant acted confused to purposely try to deceive the detectives.

¶ 35    Dr. Daniel Cuneo, a clinical psychologist who the court certified as an expert in clinical psychology, testified that he examined defendant on January 18, 2019, and June 4, 2019, to

15

evaluate his fitness pursuant to a court order. He also evaluated defendant's sanity on May 8, 2020. Dr. Cuneo identified State's exhibit Nos. 74 and 75 as his fitness report dated June 4, 2019, and his sanity report dated May 28, 2020, respectively. In making those reports, he reviewed his prior reports, police reports, discovery, statements provided to him, the November 8, 2018, grand jury transcripts, clinical files from the jail, medical records from Elgin Mental Health Center and Gateway, and Dr. Killian's report. He also spoke with the nursing staff at the jail and jail personnel as to defendant's behavior since his incarceration.

¶ 36    Dr. Cuneo testified that when he first saw defendant in January, and then in June of 2019, he was disoriented and could not provide the correct month or year. Defendant stated he was in "a dungeon in hell." However, in May 2020, defendant was oriented. As to psychotic features, Dr. Cuneo stated defendant had a history of hallucinations. When he saw defendant in June 2019, defendant admitted to everything the doctor could pose to him, such as auditory and visual hallucinations. Dr. Cuneo explained this was significant because no matter what he asked, defendant agreed it was occurring, which indicated feigning. He further stated that while there was no doubt that defendant might be mentally ill because of his history of psychiatric hospital stays, defendant's thinking was "completely goal directed." Dr. Cuneo explained that defendant claimed he could be invisible, the Illuminati was out to get him and caused of all of his difficulties, and he had been built as a robot. However, when an individual had extreme auditory and visual hallucinations and extreme delusions, all symptoms should be tied together. Defendant's thinking was not loose, but tangential or bouncing from subject to subject.

¶ 37    Dr. Cuneo testified that defendant had periods of depression throughout his life and when asked why, defendant stated that he was a slave to the voice control monitoring system and V2K[2]

---

[2]V2K stands for voice to skull and is a neuro-electromagnetic device used to transmit to the skull.

put a monitor in his head when he was a baby. Dr. Cuneo stated that usually if someone had strange delusional symptoms, they would be consistent over time. His review of defendant's medical records revealed a history of bipolar disorder and suicidal ideations, but there were never any bizarre or strange delusional symptoms noted, and never a mention of V2K or the Illuminati. Dr. Cuneo stated those symptoms seemed to occur only when he first examined defendant.

¶ 38 Dr. Cuneo testified that defendant downplayed his alcohol and drug involvement, insisted he never drank heavily, and never used drugs. However, defendant later stated he used marijuana and cocaine.

¶ 39 Dr. Cuneo testified DSM-5 was the fifth edition of the diagnostic and statistical manual of mental disorders, published in 2013. He further stated it was the gold standard for anyone in the field of psychology, psychiatry, social work, and mental health.

¶ 40 Dr. Cuneo testified that defendant feigned memory difficulties and gave less than truthful and conflicting statements. Dr. Cuneo testified that based on his assessment and application of the governing diagnostic manual, defendant's primary diagnosis was malingering, which "is feigning or exaggerating mental illness in an attempt for secondary gain, whether it be for monetary or for avoiding prosecution." As an example, Dr. Cuneo stated defendant told police that he found the gun used in murder, but he told Dr. Cuneo that he had possessed the gun since 2016 and always used it to defend himself. Defendant also told the hospital that he took amphetamine prior to the shooting but his blood tests revealed no drugs in his system. Dr. Cuneo also noted, with respect to long-term memory, that defendant could give a history when he chose to do so.

¶ 41 Dr. Cuneo's secondary was unspecified personality disorder, which was clinically significant stress or impairment in social or occupational functions but where the full criteria for any specific personality disorder was not met. Dr. Cuneo also diagnosed defendant with

17

schizoaffective disorder, depressive type, which was an uninterrupted period of illness during which there was a major mood disorder. Dr. Cuneo explained that schizoaffective disorder was different than schizophrenia, with the former being schizophrenia with a super-imposing mood disorder. He agreed that it would be fair to say that schizoaffective disorder could be described as essentially having highs and lows in mood coupled with hallucinations and delusions that could be apparent during a high or low mood. Dr. Cuneo also diagnosed defendant with cannabis and cocaine use disorder.

¶ 42     Dr. Cuneo testified that in his opinion, defendant was not intellectually limited, knew that shooting someone could cause death, and that defendant could have controlled his behavior if he so desired. He opined that, beyond a reasonable degree of psychological certainty, defendant was currently grossly exaggerating any type of mental health difficulties and was legally sane at the time of the alleged offense. He further opined that defendant would qualify for the classification of guilty but mentally ill.

¶ 43     Dr. Cuneo stated that he reviewed Dr. Killian's report dated October 11, 2019. Dr. Cuneo testified that Dr. Killian did not use the DSM-5 because Dr. Killian used an axis in diagnosing defendant which was not used in the DSM-5. He noted that, unlike himself, Dr. Killian did not report a personality disorder and found probable schizoaffective disorder. Dr. Cuneo stated one could conceivably use the terms "provisional" or "rule out," but the word "probable" was not used in the DSM-5 and he was not familiar with the use of that term in relation to a diagnosis.

¶ 44     On cross-examination, Dr. Cuneo agreed the vast majority of his examinations for the court were for the purpose of determining fitness. He also agreed that the purpose of a fitness examination was different than a not guilty by reason of insanity examination, stating his fitness report contained evidence of defendant's mental state at the time of the examination to determine

18

his ability to go to trial, whereas the purpose of the not guilty by reason of insanity report regarded defendant's appreciation for the criminality of his conduct at the time of the offense. He stated that a defendant could be fit to stand trial and still be determined to be not guilty by reason of insanity.

¶ 45    Each time Dr. Cuneo visited defendant for a fitness evaluation, he spoke with the jail staff, including the nurse, and reviewed defendant's medications. He also called the jail that day to verify defendant's medications because it did not make sense to him that defendant was acutely psychotic, or at least acting acutely psychotic in January and June of 2019, but when Dr. Killian evaluated defendant on October 11, 2019, Dr. Killian stated defendant had been on medications and had gotten a lot better. Dr. Cuneo discovered that defendant began taking Risperdal, an antipsychotic, and Remeron, an antidepressant, on February 27, 2019. Dr. Cuneo agreed that he would normally note anything relevant from the jail staff, and he did not see a note in his June 2019 report listing the medications that defendant was taking. Dr. Cuneo testified he reviewed the website for Risperdal and it stated one would expect a change in two weeks and the maximum benefit would occur around six to eight weeks. He explained that if he saw defendant in January and defendant was put on Risperdal in February, defendant would have had the maximum benefits in April. However, defendant was still acutely psychotic or at least endorsing all that psychosis when Dr. Cuneo saw him in June. Therefore, either the medication was not working or defendant was faking his symptoms.

¶ 46    Defense counsel asked about the use of axes classification and whether the DSMs had the same concept although the most recent version no longer referred to the concept as axes. Dr. Cuneo stated it was a completely different concept, and the DSM dropped that concept once it was determined not to be a reliable measure.

19

¶ 47    Counsel turned Dr. Cuneo's attention to defendant's medical records, and Dr. Cuneo agreed the records for the first admission to Elgin Hospital dated June 17, 2013, to July 17, 2013, indicated defendant was diagnosed with schizophrenia paranoid type. He further agreed paranoid schizophrenia would be characterized by delusions and/or hallucinations, but the records did not detail defendant's paranoia. Dr. Cuneo stated the admission papers for Gateway Regional Medical Center dated September 5, 2013, stated defendant ran out of his medication for the previous two or three weeks and admitted to auditory hallucinations. Dr. Cuneo testified defendant was not having any delusions at that time because the records stated he was negative for paranoia, frustration, agitation, anxiousness, and hostility. He stated the records noted that defendant felt paranoid around people but there was no detail regarding defendant's paranoia. There was also no indication as to what the voices were telling defendant or what were the sources of the voices. Dr. Cuneo agreed that the records noted defendant displayed psychotic behavior but there was again no detail indicating what psychotic behavior he was exhibiting. Dr. Cuneo testified that if Gateway was correct in their diagnosis, which was bipolar disorder depressive with psychosis, defendant would not have had any bizarre delusions.

¶ 48    Dr. Cuneo stated the record from defendant's second admission to Elgin, dated October 30, 2013, to December 3, 2013, indicated defendant expressed suicidal thoughts. His diagnosis from that visit did not indicate psychosis, but rather a depressive disorder not otherwise specified and they ruled out bipolar disorder. Dr. Cuneo agreed the records showed that Risperdal was added the week of November 3 to control defendant's symptoms of auditory hallucinations but stated that they did not diagnose defendant later, on the discharge summary, with having any type of psychotic behavior.

¶ 49    Dr. Cuneo agreed that the records from the last admission from Gateway dated June 2014 showed defendant told staff that he was paranoid around people, felt like people were watching him, and was having thoughts of harming others. He also agreed that the records did not include any specifics about whom defendant thought was watching him or whom defendant wanted to harm or why he wanted to harm others. Dr. Cuneo stated defendant was diagnosed with bipolar disorder depressive type with psychosis which indicated to him that defendant would not have any type of delusional behavior because there was no other diagnosis of bipolar, schizoaffective, or schizophrenia. When counsel asked if psychosis was characterized by hallucinations and delusions, Dr. Cuneo answered if someone was bipolar and having hallucinations, they would be mood congruent. In other words, the hallucinations would not be due to the paranoia, they would be due to a voice telling you that you were evil and you should kill yourself or another. Dr. Cuneo testified the hallucinations would not be based upon something like V2K or Illuminati. When asked if any of the medical records gave any details whatsoever about defendant's hallucinations, Dr. Cuneo replied, "No. But anything that is bizarre, I would hope someone would have noted."

¶ 50    Dr. Cuneo agreed that he believed defendant was still grossly exaggerating his symptoms in May 2020 even though he indicated that defendant improved in some areas. He stated defendant continued to repeatedly talk about the V2K and the Illuminati but would only still talk about them when raised by Dr. Cuneo. Dr. Cuneo clarified that defendant was exaggerating his symptoms in May 2020 and grossly exaggerating them in January and June of 2019.

¶ 51    When asked whether Dr. Cuneo saw any evidence that defendant exaggerated his symptoms during his police interrogation, Dr. Cuneo stated that defendant never once spoke about the Illuminati, V2K, or hearing voices. He further stated most of defendant's answers were goal directed and there was no sign of any type of mental illness in the police interview. Dr. Cuneo

21

acknowledged that in three separate forensic interviews, defendant mentioned V2K and the Illuminati, but believed those statements were made in an effort to avoid prosecution. Dr. Cuneo believed the improvement shown from June 2019 to May 2020 was a willful change and that was not due to any type of medication.

¶ 52    Dr. Cuneo agreed that some of the reports from defendant's hospitalizations and his own sanity report indicated that defendant had a history of noncompliance with his medications. He also stated that the records showed defendant did better behaviorally when he was on medication. However, it was unknown whether defendant was taking medication at the time of the offense because his statements in this regard were inconsistent and no medication was found in his system.

¶ 53    Dr. Cuneo testified that in his report, he did not refer to any of the witnesses' statements, although he reviewed the statements in making his report. He also agreed that he did not refer to anything defendant said or did on the day of the offense in his report.

¶ 54    He also reviewed the videotape statement of defendant and did not see any indication of cognitive confusion in his independent statements to police. Dr. Cuneo agreed that defendant gave police officers very inconsistent statements, much like he did to everybody else. Dr. Cuneo understood defendant asking to go home numerous times as defendant's desire for everything to be over, and not as a sign of psychosis. He again stated there was no mention of the Illuminati, V2K, or voices. Dr. Cuneo also stated defendant did not admit to any type of hallucinations during his hospital visit after the offense and that the hospital would have asked. He testified that defendant's first mention of the Illuminati and V2K occurred when he first interviewed defendant. He agreed that the detectives did not specifically ask defendant if he was hearing voices or if he had a history of mental illness.

22

¶ 55    Dr. Cuneo agreed that defendant stated he shot Williams because he felt like it was right. When counsel asked if that sounded like a logical explanation for shooting someone, Dr. Cuneo stated he was sure there was a logical explanation for shooting someone and that it was his understanding that defendant said he did not take the car because there was blood in it.

¶ 56    On redirect examination, Dr. Cuneo testified that the doctors in Alton Memorial emergency room were trained to identify symptoms of psychiatric or mental illness and there was no indication that any of the doctors that treated defendant on October 16, 2018, had any concerns about his psychiatric well-being. Dr. Cuneo testified that prior to being charged with first degree murder there was no record showing defendant made any mention of the Illuminati or grand delusions. The Illuminati, V2K, and all of the various delusions occurred after he was charged with murder. Dr. Cuneo testified that lying to the police was not an indication of mental illness and it was fairly common. He stated many times that to lie took more effort than to tell the truth, because the individual had to put factors together. He agreed there was nothing about defendant's lies that caused him to be concerned of psychosis. When the State asked if lying showed defendant was functioning at a normal or higher than normal intellectual ability, Dr. Cuneo testified that he could not say that lying demonstrated a normal or higher than normal intellectual ability, but stated the fact that defendant graduated from high school and also attended some junior college coursework meant he was clearly not intellectually limited. Dr. Cuneo again testified that it was his opinion that defendant was legally sane at the time that he murdered Williams. He further stated his belief that defendant had a mental illness that impaired and affected his reasoning and judgment, but it did not substantially impair his ability to appreciate the criminality of his conduct.

¶ 57    On recross-examination, Dr. Cuneo testified that he did not believe defendant was feigning when he told Elgin State Mental Hospital or Gateway Regional Medical Center that he was hearing

23

voices. He stated that he believed that once the murder occurred, defendant exaggerated his symptoms. When asked if defendant was feigning during his interrogation, Dr. Cuneo stated that defendant did not have any signs of psychosis and the psychosis came about once he was placed in jail. At the conclusion of Dr. Cuneo's testimony, the State rested.

¶ 58    Defense counsel made a motion for directed verdict arguing the State had not proven beyond a reasonable doubt that defendant murdered Williams. The circuit court denied the motion.

¶ 59    Sharnice Hicks testified for the defense. She stated in October 2018, she met defendant and spent two or three nights with him in her apartment. Hicks testified that defendant acted a little strange, like in the middle of the night he ran back and forth yelling out random things. Defendant would wake Hicks up out of her sleep. She stated she did not know what he was talking about and none of it made sense. Hicks testified this would happen throughout the night. She stated he yelled, screamed, ran back and forth yelling out random things, slammed doors, and beat on the walls. When asked if it gave her cause for concern, Hicks stated that it bothered her and scared her, so she told him to leave.

¶ 60    On cross-examination, Hicks testified that she knew defendant for about a month or so. She stated he was hearing voices, and on October 16, 2018, she told him to leave. When asked if she had defendant leave because her lease stated she could not have anyone stay for longer than seven days, Hicks stated she told defendant to leave because she felt uncomfortable. She did not find out about her lease restrictions until afterwards. Hicks agreed that she gave a statement to Detective Marcos Pulido on October 16, 2018. When asked if she remembered telling the police that she was not afraid of defendant, Hicks stated she did not remember what she said. She testified that she was supposed to be on medication because she was diagnosed with schizophrenia, and she

24

could have said anything if she was scared. The State asked whether Hicks went to Centerstone[3] with defendant. Hicks testified she did not remember, but she could have. When asked if Hicks heard voices with her diagnosis of schizophrenia, she stated she did not hear voices at that time but had heard voices before. She testified that she could have said anything in October 2018, and probably did, because she was not on her medication and felt uncomfortable with defendant being in her house. Hicks admitted she was a patient at Centerstone and suffered from schizophrenia, depression, and multiple other things. She agreed that her diagnosis affected her ability to hear, see, and remember things correctly.

¶ 61    Renee Johnson testified that she resided in Chicago, Illinois, and defendant was her first cousin. Johnson testified defendant was raised in the projects in Chicago when crack cocaine was really bad, and defendant's mother was a drug addict. She stated it was so bad that defendant and his sisters were put into foster care when defendant was between 8 and 10 years old. From that point, Johnson did not see defendant for years but spoke with him on the phone periodically. She stated around 2010, he stayed at her house. She testified that during the daytime, defendant was okay, but at night, defendant freaked her out because he would stand over her bed and say "did you hear them talking about me, you know, they're talking about killing me, I did something to them." Johnson stated because she had not seen defendant in years, it freaked her out and she would tell defendant that she did not hear anything and to just lay down, but he would come right back and say it again. She felt like he was scared so she then made a pallet at the edge of her room for him to lay on.

¶ 62    Johnson testified there was another incident in 2011 or 2012 at her grandmother's house where she saw defendant bash his head in a mirror and she called the ambulance. The ambulance

[3]Centerstone is mental health an addiction treatment facility.

took defendant to the psychiatric ward at Jackson Park in Chicago. Johnson testified that in 2018, she resided in Poplar Bluff, Missouri, and defendant would visit every two weeks or every month. At the visits, he was usually pretty happy. He ate everything in her house and played basketball with her kids. However, in October 2018, defendant visited and was different. He did not talk much, seemed "somewhere else in his mind," and she knew something was wrong. When the October 2018 visit was over, she took defendant to the train station. When she left the train station, she started crying because she knew something was wrong. So, she went back and told him to please not hurt himself or hurt anybody. Johnson testified that was the last time she saw defendant. The Sunday before the murder of Williams, defendant contacted Johnson and stated "put the Bible down." There was no further explanation. She stated she should have called defendant, but did not do so.

¶ 63    On cross-examination, Johnson stated she did not know what "put the Bible down" meant. She testified the last time defendant visited her in Poplar Bluff was in October 2018, about a week before the murder. She stated he was distant and depressed. She agreed he did not bang his head into the mirror at that time or talk about voices. When asked if she called anyone to report defendant's behavior, Johnson stated she may have called her mother but did not call a doctor. When asked if she called 9-1-1, she stated there was nothing to report and it was just a feeling. Johnson testified that other than defense counsel, she also told her family about defendant's behavior before trial. She stated she did not know any of defendant's doctors and knew he had a hard time getting doctors. When asked if Johnson loved her cousin and did not want to see him get in trouble, she stated she loved her cousin and if he was supposed to be in trouble then he was supposed to, but she knew he was ill.

26

¶ 64    Dr. Terry Killian, a clinical and forensic psychiatrist who the circuit court found to be an expert of forensic psychiatry, testified that before he examined defendant, he reviewed more than 100 pages, including police reports, psychiatric treatment records from Elgin Mental Health Center and Gateway Regional Medical Center, and a few other documents, as well as a DVD recording of the police interrogation of defendant. Dr. Killian identified defense's exhibit No. 2 as the report he prepared for this case, and the court admitted the report into evidence. Dr. Killian also identified defense's exhibit No. 3 as the medical records he reviewed in preparation of his report. The circuit court entered the medical records into evidence.

¶ 65    Dr. Killian stated he diagnosed defendant with probable schizoaffective disorder because he met the criteria for schizophrenia but it was unclear whether defendant had the mood disorder required for a diagnosis of schizoaffective disorder. He explained the hospital records listed defendant as having both schizoaffective disorder and schizophrenia. The two diagnoses were very similar, the only difference being there was a significant mood disturbance in schizoaffective disorder. Dr. Killian stated from the limited documentation he had available, there was no question that defendant had significant clear schizophrenic symptoms, but it was not clear that defendant had a substantial mood disorder, although it was probable. Dr. Killian clarified he meant that he was not certain that there was a substantial mood disorder as opposed to only schizophrenia.

¶ 66    Dr. Killian testified the documentation from the hospitals was unfortunately very limited, but the symptoms defendant reported included several different phrases that all meant paranoia. Dr. Killian stated that defendant was also described as having a flattened affect, which meant "a limited range of emotional expression." He further explained that "a certain subset of patients with schizophrenia will have a flat affect, where from basically from the eyes up nothing moves when they talk." Auditory hallucinations were also something that defendant complained about as well

27

as some mood symptoms and depressive symptoms. Dr. Killian agreed that his opinion was that the medical records reflected a significant history of paranoid delusions. Dr. Killian stated that he was almost certain that every one of defendant's hospitalizations included psychotic symptoms and one of the diagnoses was bipolar mood disorder with psychotic features. Based on his review of the medical records, Dr. Killian stated defendant responded very well to the antipsychotic medications.

¶ 67    Dr. Killian testified that although the concept of axes as a means of diagnosis were not present in the DSM-5, he found them helpful in organizing patients' problems. He testified there was no rule stating he could not rely on them, and the DSM-5 was not an absolute resource.

¶ 68    Dr. Killian agreed that he reviewed defendant's prison records after he wrote his report but before his testimony. Dr. Killian testified that the records indicated defendant showed significant evidence of aggression, bizarre behavior, and some paranoia when he was first arrested and that he attacked another inmate with no provocation whatsoever. He noted this occurred when defendant was not on medication. He also stated there were a couple of notes that indicated odd behavior although there was not a lot of documentation of the behavior. Dr. Killian testified there was no documentation in January 2019 and then, in the middle of February 2019, defendant was put on the antipsychotic medication risperidone and also an antidepressant medication, Remeron. From that point, according to the jail records, defendant started improving, although defendant was inconsistent with his medication at first. Dr. Killian stated there was a note in the middle of March 2019 that there was another incident where defendant was verbally, but not physically, aggressive and made a threat to another inmate. He testified it was not clear when defendant started consistently taking his medication, but he was apparently taking his medication consistently by

28

June 2019 when Dr. Cuneo saw him. Dr. Killian stated once defendant got stabilized, there were 15 months of records with no evidence of aggression or bizarre behavior.

¶ 69 Dr. Killian testified that defendant reported his symptoms were much better with medication. Defendant stated the voices were much less intense and demanding of him, and he was more able to ignore the voices. Dr. Killian stated this was typical of schizophrenic patients. Defendant also reported that he was not being tormented anymore, that the television was not talking to him, and that he was not getting into trouble.

¶ 70 Dr. Killian testified that when he spoke with defendant, he asked defendant about V2K because it was noted in Dr. Cuneo's report. Defendant stated the V2K stands for voice to skull and said it was some sort of electronic process that was used to scare birds away and somehow "they" put it into him. Defendant also talked a little bit about the Illuminati and how they were plotting against him.

¶ 71 Dr. Killian opined with a reasonable degree of psychiatric certainty that defendant was too impaired by his chronic psychotic condition to adequately appreciate the criminality of his behavior regarding the shooting of Williams or entering the Rosa Avenue house. He believed the best evidence of defendant's mental state at the time of the crime was always contemporaneous evidence. He testified defendant's behavior on the day of this shooting supported his opinion that defendant did not understand the criminality of his conduct that day. He explained there were at least four witnesses in the community who described defendant as acting bizarrely, noting defendant went into the home of a couple and asked them where he was and when they told him to leave, he did so without taking anything or being threatening.

¶ 72 Dr. Killian also stated defendant's behavior was certainly odd during the police interrogation, but he saw no evidence of defendant malingering. He had seen many defendants try

29

to malinger, but he did not see any indication of that with defendant. Rather, defendant seemed confused. Dr. Killian explained that defendant gave inconsistent information about where the gun was found, which could be interpreted as misleading the police, except defendant acknowledged having committed the murder. He said there were a lot of trivial things defendant seemed confused about which did not make sense. Dr. Killian stated he believed that defendant's confusion was not deliberate or an attempt to mislead the detectives. He testified that if defendant was going to admit to the murder, he would have no reason to lie about the other things. Dr. Killian stated that when someone is trying to malinger, it is "usually pretty obvious about what they are doing." Dr. Killian also testified defendant gave an odd, nonsensical explanation for shooting Williams, which was very strange and strongly suggested delusional thinking.

¶ 73    He noted that people who malingered often sounded as if they were reading from a textbook, and defendant gave details that suggested actual lived experiences as opposed to something he read in a book. Specifically, defendant stated Williams "just kind of looked like the kind of person that would do this to me." He also said that when he saw Williams, it was like Williams was the one he was looking for, with no further explanation. Dr. Killian stated defendant indirectly meant Williams was the one causing the problems for defendant. Dr. Killian again stated it did not make sense for defendant to admit to the crime if he intended to malinger.

¶ 74    Dr. Killian testified that defendant told him that he had stayed with a friend for three or four days prior to the shooting and was having a lot of auditory hallucinations or voices that were keeping him up and telling him to do bad things. Defendant described it as "sort of like a ghost haunting him." Dr. Killian stated one interesting thing defendant said was that he would not have told police he committed the crime if he was in his right mind, and he told police he committed the crime because he was doing what they wanted and thought they might give him a reward. In

30

the October 2019 interview, defendant expressed a lot of remorse and found the fact that Williams was 90 years old made it even worse.

¶ 75    When asked whether defendant's medical records from his hospitalization after being arrested indicated if the hospital conducted a psychological evaluation, Dr. Killian stated that because defendant went to the hospital for vomiting and not for psychiatric reasons, the hospital would not have done anything beyond a brief description of defendant's mental state unless someone raised a psychiatric issue. Dr. Killian also stated that even if defendant displayed psychotic symptoms, the hospital's role was to determine if defendant was medically fit to send to jail and they would not typically get involved in starting psychiatric treatment because they were not psychiatrists.

¶ 76    Dr. Killian concluded his direct examination by offering his opinion, to a reasonable degree of psychiatric certainty, that defendant was "too impaired by his chronic psychotic condition to have been able to adequately appreciate the criminality of his behavior" at the time he shot Williams. Dr. Killian also concluded that defendant did not appreciate the criminality of his conduct when he entered the house on Rosa Avenue.

¶ 77    On cross-examination, the State asked if it was correct that Dr. Killian did not diagnose defendant with schizophrenia. Dr. Killian said that he could not answer the question with yes or no. The State asked if the schizophrenia and schizoaffective disorder were in different chapters of the DSM. Dr. Killian stated they were "basically almost" the same diagnosis. After the State again asked if Dr. Killian diagnosed defendant with schizophrenia, Dr. Killian conceded he did not diagnose defendant with schizophrenia. The State then asked if it was correct that defendant was not diagnosed as having schizoaffective disorder. Dr. Killian stated it was not correct. Limited evidence suggested defendant probably had a mood disorder, but Dr. Killian could not say as such

31

with certainty, which is why he said "probable" schizoaffective. The State asked based on his testimony and what was in his report, whether Dr. Killian failed to diagnose defendant with any disorder. Dr. Killian stated that was not correct. The State asked if it was correct that Dr. Killian did not diagnose defendant with schizophrenia and stated "probable" schizoaffective disorder, but defendant lacked the mood component that was required for a schizoaffective disorder. Dr. Killian stated the evidence was not clear enough to determine with which of the two disorders defendant should be diagnosed. He further clarified that defendant certainly had "a form of schizophrenia, whether it's schizophrenia or schizoaffective is open to question."

¶ 78    Dr. Killian agreed that DSM-5 was the gold standard according to the American Psychiatric Association but stated all DSMs contained a significant number of disclaimers including that they were not intended for forensic purposes. He testified there was a big difference between clinical assessment and forensic assessment. Dr. Killian agreed the DSM-5 was very helpful and reliable and that his method for creating the diagnosis had not been recommended by the American Psychiatric Association since 2013. Dr. Killian testified it was important not to look at the diagnostic manuals in a very concrete, rigid fashion because mental illness was "not like that." The categories were not rigid and "[w]e don't have this box or this box. That is not how human beings are, it is not how our brains work."

¶ 79    Dr. Killian agreed that he met with defendant once and repeated evaluations were preferable but testified they were not really done due to cost. When asked if it was correct that Dr. Killian failed to ask for a repeat evaluation despite not having enough information to find out if defendant had a mood disorder, Dr. Killian stated that interviewing defendant again would not have answered that question. Dr. Killian stated more medical records could have possibly answered whether there was a mood component or not, but such answer was not a major issue

32

because the issue was whether defendant had a psychotic disorder and whether that disorder impaired him.

¶ 80    After Dr. Killian agreed that contemporaneous evidence was the best evidence, he stated that he did not see the medical records from Alton Memorial Hospital but read about them in one of the police reports or somewhere else. Dr. Killian agreed he was not familiar with Alton Memorial Hospital or its procedures. When asked if it would have been compelling for Dr. Killian to review the records of a hospital visit one hour after the shooting given that contemporaneous evidence was the best evidence, Dr. Killian again stated it would not if defendant was there to be evaluated for vomiting.

¶ 81    The State directed Dr. Killian's attention to State's exhibit No. 76, which were jail records from May 2020. Dr. Killian stated the records showed that defendant reported to be suicidal partly because he was seeking to get away from other inmates and partly because he did have suicidal thoughts. The State asked for the term meaning "when somebody used psychiatric symptoms in order to benefit themselves," and Dr. Killian responded that the term was "malingering."

¶ 82    The State then turned to the Alton Police Department interview of defendant. Dr. Killian stated it was not fair to say that defendant appeared confused about the gun in the first portion of the interview until he was confronted with the fact that the officers knew he was lying. Dr. Killian stated he did not remember the exact sequence of the interview, but it could be true that defendant admitted to everything only after he was confronted with the fact that he was on the video in the area that he denied being. Dr. Killian disagreed that it was equally possible that defendant was lying to get out of trouble, rather than being confused, because there was a lot of confusion. After the State asked if Dr. Killian factored in his decision defendant's statement that he told the police

33

that he was lying, Dr. Killian stated defendant may have lied about some things, but there was clearly confusion on defendant's part during the first portion of the interview.

¶ 83     Dr. Killian believed he watched the entire interview with defendant but could not say with 100% certainty. He also believed he viewed the portion where defendant reenacted the murder with the detectives, but he could not specifically recall it. He stated it would not be particularly important if defendant had the ability to stand up and reenact the murder with the detectives but agreed defendant's correction of the detectives about how the body was positioned would be somewhat important. The State asked why defendant waited an hour and 23 minutes to confess, instead of doing so right away, if he only confessed to murder because he thought he was going to get a reward. Dr. Killian testified he did not know for sure, but he knew that defendant was ill at that time, the police used a lot of coercive techniques, and the police may have influenced him. Dr. Killian again testified that defendant was not lying but agreed if someone lied for an hour and 23 minutes about a crime, then ultimately admitted to the crime, it would probably be evidence that that person knew it was wrong.

¶ 84     On redirect examination Dr. Killian testified there was "no question" that defendant had a psychotic illness, specifically some sort of schizophrenic illness. He stated that whether it was schizophrenia or schizoaffective disorder, or whether the potential diagnoses were in different chapters of the DSM-5, was not relevant because they were essentially the same disorder except one also has a significant mood component. The defense then rested.

¶ 85     After the parties provided closing arguments, the circuit court took the matter under advisement to review all of the evidence. The following morning, the circuit court offered its condolences to the Williams family. It then commented that it was sorry the mental health system failed defendant. The circuit court stated its job was to listen to all of the evidence and decide the

34

case on the evidence presented. The circuit court then found that the State proved beyond a reasonable doubt that defendant was guilty of first degree murder, criminal trespass to a residence, armed violence, unlawful possession of a weapon by a felon, and unlawful possession of a stolen firearm, as well as defendant personally discharging a firearm that caused the death of Williams.

¶ 86 In addressing defendant's affirmative defense of insanity, the circuit court stated it considered every piece of evidence that was presented and reviewed every video, audio, and picture. It also stated it considered every report and read them thoroughly, as well as the hospital records. The circuit court noted it was presented with two experts and found both to be highly qualified, incredibly experienced, and knowledgeable. It further noted the two competing experts had completely differing views on defendant's condition and both were believable. As such, it looked at the rest of the evidence in the case and the basis for both expert opinions. The circuit court stated it could see the mental illness to some degree in certain things and the thought process of criminality in other things.

¶ 87 The circuit court said, "And I would like to point out to one particular thing that stuck out in my mind, but by no means was the only decision in the thing I thought about." The circuit court then recounted the beginning of defendant's interview where, before the officer left the room for a moment, he warned defendant that the room was video and audio recorded so defendant did not "pick his nose" or doing anything else embarrassing. Then, immediately after the officer left the room, defendant looked straight at the camera and stuck his finger in his nose and twisted it. The circuit court further said:

"And that particular act stuck with me, and the reason it stuck with me wasn't because the picking of the nose, it was because it was clear at that moment that a few hours after the murder [defendant] heard what was said to him, didn't really acknowledge what was said

35

to him, but he definitely heard it, and in response to that comment he clearly didn't like, he turned and looked at the camera and picked his nose.

It was an act of—I don't know, defiance, an act of anger. One could argue well that's not what someone who is insane does. But he understood what was said to him and he understood you shouldn't do it, and he made a point of just doing it just to make a point, and that act stuck with me as I looked through the rest of the statements that he made, because there were times he would look at the wall and not acknowledge someone's presence. That doesn't mean he wasn't listening, it didn't mean he didn't understand, and I know that from his very first action on his own with nobody in the room."

¶ 88 The circuit court then stated that looking at all the evidence, it found that defendant did not prove by clear and convincing evidence that he was not guilty by reason of insanity. The circuit court, however, found defendant proved by a preponderance of the evidence that he was mentally ill and affected with a substantial disorder of thought, mood, or behavior, which impaired his judgment, but not to the extent that he was unable to appreciate the wrongfulness of his behavior. The circuit court entered an order to the same effect on October 1, 2020.

¶ 89 On October 30, 2020, defendant filed a motion for a new trial alleging several errors, including that he proved by clear and convincing evidence that he was not guilty by reason of insanity. An amended motion for a new trial was filed on November 5, 2020, which made a minor correction to defendant's name but alleged the same contentions of errors as the initial motion for a new trial.

¶ 90 On March 17, 2021, a hearing was held on posttrial motions. Defense counsel argued that the verdict should be overturned because, *inter alia*, defendant met his burden of proving by clear and convincing evidence that he was legally insane at the time of the murder and Dr. Killian's

testimony in this regard was supported by the evidence surrounding defendant's actions that day. Defense counsel also argued contemporaneous evidence is the best evidence when determining the question of sanity at the time of the commission of the offense and neither Dr. Cuneo's written report, nor his testimony, referenced any of defendant's actions or behaviors the day of the murder, or any other contemporaneous evidence to support his opinion.

¶ 91    The State argued the circuit court heard from both experts and found them both to be credible. It further stated defendant attempted to hide in the residence of Cynthia Pratt and Stuart Mehl after he murdered Williams. It also noted defendant confessed clearly and calmly and was even able to reenact the murder for police. The State argued this evidence showed that defendant knew what he was doing and that it was wrong.

¶ 92    The circuit court stated that when it announced its verdict, it specifically addressed that it believed both Dr. Killian and Dr. Cuneo to be experts and to be true to their oaths. It stated in reviewing all the evidence as presented, it found that defendant met the requirements for guilty but mentally ill but did not prove the requirements for a finding of not guilty by reason of insanity, and the circuit court believed those findings were still correct. It therefore denied the motion for a new trial.

¶ 93    The case proceeded to sentencing on March 19, 2021, and the circuit court sentenced defendant to a total of 80 years' imprisonment. A hearing on defendant's motion to reconsider sentence was held on March 29, 2021, and the circuit court denied the motion. Defendant timely appealed.

¶ 94                                              II. ANALYSIS

¶ 95    On appeal, defendant's sole issue asserts the trial court erred in failing to find defendant not guilty by reason of insanity. Section 6-2(a) of the Criminal Code of 2012 states, "A person is

not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2018). However, a person who was not insane at the time of the commission of a criminal offense but was suffering from mental illness is not relieved of criminal responsibility. *Id.* § 6-2(c). Mentally ill is defined as "a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior." *Id.* § 6-2(d). "All defendants are presumed to be sane." *People v. Cundiff*, 322 Ill. App. 3d 426, 433 (2001). The defendant holds the burden of proving by clear and convincing evidence that the defendant was not guilty by reason of insanity. 720 ILCS 5/6-2(e) (West 2018). "Only insanity at the time of the offense can excuse criminal responsibility." *People v. Meeker*, 86 Ill. App. 3d 162, 168 (1980).

¶ 96    The issue of a defendant's sanity is one of fact and the trier of fact's determination on that issue will not be reversed unless contrary to the manifest weight of the evidence (*People v. Urdiales*, 225 Ill. 2d 354, 428 (2007)), meaning "the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented" (*People v. Deleon*, 227 Ill. 2d 322, 332 (2008)). Under this standard, we give the fact finder deference "because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Id.* We will not substitute our judgment for that of the fact finder regarding witnesses' credibility, weight given to the evidence, or the inferences drawn from the evidence. *Id.*

¶ 97    Defendant contends on appeal that the most exhaustive evidence that he was not guilty by reason of insanity was Dr. Killian's not guilty by reason of insanity report, which he asserts was more credible than Dr. Cuneo's report. He argues that Dr. Killian relied on more reliable

information to determine defendant's psychosis on the date of the murder by placing a heavy emphasis on the more reliable contemporaneous evidence of defendant's behavior and responses to police during the interrogation and eyewitness statements. He further argues that Dr. Cuneo's report did not scrutinize defendant's actions or statements on the day of the shooting, nor did it mention the eyewitnesses' observations of defendant. Defendant further contends that Dr. Killian's report was more thorough and provided much detail regarding the evidence he relied upon and defendant's symptoms.

¶ 98    The State responds that Dr. Cuneo's report was more credible where Dr. Killian significantly undermined the accuracy of his perceptions where his report stated, "I viewed the interrogation on a fairly small window screen *** I could not see defendant's face very well." It further contended that Dr. Killian put a lot of stock into what defendant said to him; however, "[o]ne of the factors the [trier of fact] could consider is to what extent the psychiatrist's diagnosis rests on information related by the defendant since self-serving or untruthful statements could affect the resultant diagnosis." *People v. Romaine*, 79 Ill. App. 3d 1089, 1096 (1979). Additionally, the State argues that Dr. Killian's fixation on defendant's mental illness prevented him from hearing key information from the interrogation that established defendant's guilt. Dr. Killian provided no notes on the key admissions defendant gave to police at the end of his interrogation. Dr. Killian stated he could not provide an alternative, non-psychiatric explanation for the crime even though—in the State's opinion—defendant admitted to killing Williams because he wanted the car. The State further contends Dr. Killian could not have comprehensively analyzed the evidence when he ignored the explicit admission of guilt, and defied common sense by chalking the admissions up to defendant essentially repeating back what he was told. The State further

39

asserts that Dr. Cuneo's evaluation was more credible, because Dr. Cuneo used the most updated procedures from the DSM-5 to make his determinations.

¶ 99 In consideration of the competing arguments, we find—as defendant admits—Dr. Killian and Dr. Cuneo relied on many of the same diagnostic criteria, and while Dr Killian was not sure whether defendant had a substantial mood disorder to render his diagnosis schizoaffective rather than schizophrenic, the two experts made similar diagnoses. The experts only significantly differed as to their conclusions. The trial court found both experts were credible, and defendant does not contend that Dr. Cuneo's report was so unreliable or invalid that it was inadmissible. Rather, defendant's argument asks this court to reweigh the evidence from both experts and find Dr. Killian more credible, which we cannot do. See *Deleon*, 227 Ill. 2d at 332.

¶ 100 Contradictory expert testimony does not require finding the circuit court's insanity determination was against the manifest weight of the evidence. See *Meeker*, 86 Ill. App. 3d at 169. While—as the parties argue—there are reasons to find one expert more credible than the other, resolving contradictory expert testimony regarding defendant's sanity is for the trier of fact. *People v. Kluxdal*, 225 Ill. App. 3d 217, 224 (1991). "The trier of fact may accept the testimony of one expert over that of another as long as the accepted opinion is based on a credible diagnosis." *People v. McDonald*, 329 Ill. App. 3d 938, 946 (2002). The trier of fact is also free to "accept part and reject part of each expert's testimony." *People v. Stack*, 311 Ill. App. 3d 162, 174 (1999). Therefore, the trier of fact may accept the expert's conclusion that the defendant was mentally ill at the time of the offense but reject the expert's conclusion that defendant was legally insane. *People v. Thurman*, 223 Ill. App. 3d 196, 201 (1991). The court here was presented with two credible but contradictory expert opinions, which raised a question of fact, that the court was entitled to resolve against defendant. *Stack*, 311 Ill. App. 3d at 174; see also *People v. Bishop*,

40

2024 IL App (2d) 230106, ¶¶ 53-55; *McDonald*, 329 Ill. App. 3d at 947; *People v. Williams*, 201 Ill. App. 3d 207, 219 (1990).

¶ 101 Defendant further contends the remaining evidence required a finding of insanity. He argues the sheer amount of mental health hospitalizations defendant accrued is persuasive evidence that he was acting under the influence of his mental health struggles on the day of the shooting. He further asserts the lay witness testimony showed that he was acting bizarre in the days shortly before the shooting and his actions on the day of the shooting demonstrate that he was not thinking clearly and did not have a clear grasp on where he was or what he was supposed to be doing. Moreover, the lack of any logical explanation for the shooting proves that this was not the action of someone who was capable of appreciating the criminality of his conduct at the time of the murder.

¶ 102 Defendant also argues that the circuit court's reliance on him picking his nose when the officers left the room was incorrect. He contends it would not be unreasonable for someone in the grips of a major psychotic episode to act irrationally to a simple order. However, even taking this action as recognition that defendant knew it was "wrong," defendant asserts the gulf between murdering someone in cold blood because he thought he could get away with it and picking his nose after being told it might look silly on camera is so preposterously large that it hardly bears discussion, except to say that a trial judge equating the two is the height of absurdity. Relying on *People v. Kando*, 397 Ill. App. 3d 165, 198 (2009) (where defendant suffered from schizophrenia for over a decade, defendant's previous mental health history supported finding of insanity), defendant argues the only stated reason to find defendant guilty but mentally ill instead of not guilty by reason of insanity was both arbitrary and unreasonable.

¶ 103   We find *Kando* is easily distinguishable. In *Kando*, the First District reversed the trial court's verdict of guilty but mentally ill and directed a finding of not guilty by reason of insanity. *Id.* at 211-12. It noted it was undisputed that the crime committed by the defendant was conceived and executed in the "grip of a psychotic delusion" to "eliminate Satan pursuant to a commandment from God." *Id.* at 196. *Kando* reasoned that while the trial court could reject or give little weight to the expert psychiatric testimony, there was no basis for doing so in that case where the two experts agreed that the defendant was insane at the time of the offense. *Id.* at 197-98. Moreover, the experts considered an abundance of information before, during, and after the offense, including medical records prior to the offense and jail records after the offense that supported the experts' opinions. *Id.* at 199-200. The *Kando* court rejected the trial court's perception of the record supporting a finding of sanity where the trial court misconstrued the record (*id.* at 201-03) and all the lay testimony supported the experts' conclusion that the defendant acted under a delusion at the time of the offense (*id.* at 203-04). Specifically, the defendant also repeatedly admitted to the officers and jail staff, immediately after the offense, that he had stabbed the victim because he believed the victim was Satan. *Id.* at 204. The defendant also yelled a word meaning "God" while stabbing the victim. *Id.* The appellate court found the defendant did not flee to avoid criminality as the trial court held but rather fled due to his delusion, as evidenced by him retreating to his apartment and not unlocking the door to a person who lived with the victim—who the defendant believed was Satan—but immediately opened the door for police. *Id.* at 201, 205-06. The appellate court rejected the trial court's conclusion that the defendant attempted to conceal the murder weapon by putting it in the pantry when he immediately led the officers to the knife without evasiveness or resistance. *Id.* at 201. The First District thus found that the trial court's reasoning

for the verdict was contrary to the evidence, and that the only way to explain the defendant's behavior was the delusional episode he suffered at the time of the crime. *Id.* at 211.

¶ 104    This case is significantly different than *Kando*. In *Kando*, both experts found the defendant legally insane at the time of the offense and the other evidence supported those opinions. *Id.* at 198 (both experts agreed defendant was insane at time of offense and all other evidence corroborated those opinions). Here, there were two credible but conflicting opinions between the experts regarding defendant's ability to appreciate the criminality of his conduct at the time of the offenses charged. Moreover, the other non-expert evidence and lay testimony in this case was not so overwhelmingly in support of one expert's opinion to conclude the circuit court should have adopted the conclusions and opinions of one expert over another.

¶ 105    None of the facts cited by defendant in this case required the circuit court to find him insane at the time of the offense. The mere fact that defendant's medical records and the expert's reports noted that defendant reported hearing voices and lay testimony established defendant engaged in bizarre behavior prior to the offense does not mandate a finding of insanity. *People v. Gilmore*, 273 Ill. App. 3d 996, 1000 (1995). This is so because "[a] defendant may suffer from a mental illness without being legally insane." *Id.*; see also *Cundiff*, 322 Ill. App. 3d at 433; *People v. McCullum*, 386 Ill. App. 3d 495, 504 (2008) ("Bizarre behavior or delusional statements do not compel an insanity finding as a defendant may suffer mental illness without being legally insane."). Suffering from previous episodes of psychotic behavior does not mean defendant operated under the same disability at the time of the offense. *People v. Silagy*, 101 Ill. 2d 147, 169 (1984). Further, the fact that the offense and expressed motive seems odd also does not compel a finding of legal insanity. *Meeker*, 86 Ill. App. 3d at 168. Therefore, the circuit court was not required to find

43

defendant legally insane at the time of the offense because he displayed psychotic symptoms in days and years prior.

¶ 106   We also find unpersuasive defendant's argument with respect to the circuit court's reliance on him picking his nose while being videotaped. Despite defendant's contentions, the circuit court did not equate picking his nose with being a cold-blooded murderer. The circuit court explicitly stated its decision was based on the evidence as a whole and not based solely on defendant picking his nose. In the context of the circuit court's other statements, the statement regarding defendant picking his nose was made to indicate that defendant clearly understood what the officers were stating to him at that time.

¶ 107   Moreover, defendant's actions and confession during the videotaped interview were particularly helpful in determining his sanity, especially in light of the competing experts. See *People v. Lower*, 55 Ill. App. 3d 1014, 1021 (1977) ("The experts' opinions were thus evenly divided. A careful perusal of the defendant's written confession, however, gives a definite clue to the question of whether or not the impulse to kill the Didier boy was irresistible, by reason of insanity."). Defendant's reenactment of the offense, including his correction of the officers when they misstated what occurred, bolsters the circuit court's determination that defendant knew what he was doing. *Cundiff*, 322 Ill. App. 3d at 434. The officers' testimony that defendant seemed of sound mind also provides support for the circuit court's decision. *Id.* at 433; see *People v. Banks*, 17 Ill. App. 3d 746, 754-55 (1974) (testimony of officers who saw and talked with defendant shortly after killing that she was coherent, logical and defendant's testimony that she knew she had shot the victim and that it was wrong were sufficient to sustain determination that defendant was sane at time of killing even though defendant introduced opinions of two psychiatrists that she was suffering from chronic paranoid schizophrenic condition); *People v. Romero*, 2018 IL App

44

(1st) 143132, ¶ 66. Equally supportive is defendant's failure to note the same delusional response when he committed the crime as he did to the experts (*People v. Gilmore*, 273 Ill. App. 3d 996, 1001 (1995)), as well as defendant's fleeing when approached by officers and resisting arrest (*Romaine*, 79 Ill. App. 3d at 1097).

¶ 108   Here, the circuit court was presented with two competing expert opinions. Relying on all of the facts surrounding the crimes charged, along with the evidence admitted and the opinions of the experts, the circuit court concluded defendant was sane at the time of the murder and entry into the home on Rosa Avenue. Although defendant presented some evidence to support his affirmative defense of insanity, the circuit court heard and considered all of the evidence presented on this issue and the record contains ample evidence to support its finding of sanity at the time of the offenses. Accordingly, we cannot say that the finding that defendant was legally sane at the time of the commission of the murder and other offenses was against the manifest weight of the evidence. See *People v. Hoots*, 228 Ill. App. 3d 42, 53 (1992); *Bishop*, 2024 IL App (2d) 230106, ¶ 59; *People v. Bradley*, 220 Ill. App. 3d 890, 904 (1991).

¶ 109                                III. CONCLUSION

¶ 110   For the foregoing reasons, we affirm the circuit court's finding that defendant was guilty but mentally ill at the time the offenses were committed.


¶ 111   Affirmed.